David M. Berger (SBN 277526)
Jane Farrell (SBN 333779)
Jennifer Sun (SBN 354276)
Kate Walford (SBN 362658)
**GIBBS MURA LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: (510) 350-9700
Fax: (510) 350-9701
dmb@classlawgroup.com
jgf@classawgroup.com
jsun@classlawgroup.com
kgw@classlawgroup.com

Gary M. Klinger*
Mike Acciavatti*
Heather M. Lopez (SBN 354022)
**MILBERG PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Telephone: (331) 240-3015
gklinger@milberg.com
macciavatti@milberg.com
hmlopez@milberg.com

Daniel L. Warshaw (SBN 185365)
Matthew A. Pearson (SBN 291484)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
dwarshaw@pwfirm.com
mapearson@pwfirm.com

Renner K. Walker (SBN 295889)
Steven M. Nathan (SBN 153250)
Gisela Rosa (*pro hac vice*)
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646) 357-1100
Facsimile: (212) 202-4322
rwalker@hausfeld.com
snathan@hausfeld.com
zrosa@hausfeld.com

*pro hac vice forthcoming
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| DANIEL JAVORSKY, ANTHONY MAYOR, BRENDAN WHITNEY, LARISSA CURSARO, SALVADOR CARNERO III, TIMOTHY AUMILLER, PHYLICIA APPLEWHITE, RYAN SMITH, SEAN AREND, and KYLE JORDAN, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br> v. <br><br> FLOCK GROUP, INC., d/b/a Flock Safety, <br><br> Defendant. | Case No. 4:26-cv-02382-HSG <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> DEMAND FOR JURY TRIAL <br><br> CLASS ACTION |

# TABLE OF CONTENTS

NATURE OF THE CASE ........................................................................................ 2

PARTIES ............................................................................................................... 6

JURISDICTION AND VENUE ............................................................................. 7

FACTUAL ALLEGATIONS .................................................................................. 8

    I.     ALPR Cameras and California's ALPR Privacy Act ............................... 8

    II.    Flock's ALPR Cameras and Software Amass, Analyze, and Interpret Massive Amounts of Data, Creating Detailed Vehicle Profiles and Histories in Violation of California Law ....................................................... 12

    III.   Flock Violates California Law by Sharing California ALPR Data with Out-of-State and Federal Agencies ....................................................... 21

    IV.   Flock Violates California Law by Failing to Implement an Adequate Policy or Reasonable Security Procedures to Prevent Unlawful Information Sharing .......... 35

    V.    Flock's Security Measures Fall Far Below Reasonable Procedures and Practices ........................................................................................... 38

    VI.   Flock's Illegal Sharing of California ALPR Data is Pervasive ............................ 41

    VII.  Flock's Facilitation of California Law Enforcement Agencies' Unlawful Information Sharing Is Highly Offensive ................................................. 42

         A.    Flock's Network Amplifies Discriminatory Policing Practices ................... 42

         B.    Cross-Jurisdictional Data Sharing Threatens Access to Abortion and Gender-Affirming Care in California ......................................................... 43

         C.    Flock's ALPR System Threatens Protected First Amendment Activity ....... 44

    VIII. Flock's Active Concealment Tolls the Statute of Limitations ............................... 46

PLAINTIFFS' EXPERIENCES ........................................................................... 47

    I.     Plaintiff Javorsky's Experience ............................................................... 47

    II.    Plaintiff Mayor's Experience .................................................................. 48

    III.   Plaintiff Whitney's Experience ............................................................... 50

    IV.   Plaintiff Cursaro's Experience ................................................................ 52

    V.    Plaintiff Carnero's Experience ................................................................ 54

i

VI.     Plaintiff Aumiller's Experience.................................................................. 56

VII.    Plaintiff Applewhite's Experience ........................................................... 58

VIII.   Plaintiff Smith's Experience...................................................................... 60

IX.     Plaintiff Arend's Experience ..................................................................... 62

X.      Plaintiff Jordan's Experience .................................................................... 64

XI.     Plaintiffs' Data from Flock Cameras Has Economic Value.................................. 66

CLASS ACTION ALLEGATIONS................................................................................. 67

COUNT I: VIOLATION OF CALIFORNIA'S ALPR PRIVACY ACT .............................. 70

COUNT II: NEGLIGENCE ........................................................................................ 72

COUNT III: INVASION OF PRIVACY UNDER THE CALIFORNIA CONSTITUTION .. 74

COUNT IV: INTRUSION UPON SECLUSION.................................................................. 77

COUNT V: VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW
        ("UCL").......................................................................................... 80

PRAYER FOR RELIEF ................................................................................................ 82

DEMAND FOR JURY TRIAL ...................................................................................... 83

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

Throughout California and the United States, drivers are tracked by a network of automated license plate recognition ("ALPR") cameras and software—tens of thousands of high-definition cameras combined with artificial intelligence ("AI") and sophisticated communications networks. While other cameras used by law enforcement activate only upon detecting a violation—a vehicle running a red light for example—these cameras record information on every vehicle that passes, forming a vast, interconnected surveillance dragnet. Defendant Flock Group, Inc. d/b/a Flock Safety ("Defendant" or "Flock") owns and operates a massive network of such cameras, oversees the data warehouse that holds the billions of images and data points they capture, and controls the software and AI architecture that facilitates this nationwide surveillance network.

The California Legislature has recognized the dire threat to privacy rights and civil liberties posed by Flock's mass surveillance. In 2015, California enacted Senate Bill 34 (the "ALPR Privacy Act"), which places clear limits on the ability to legally capture, use, store, and share ALPR data. For example, Flock and other ALPR operators are barred from sharing California ALPR data with federal or out-of-state law enforcement agencies. For years, Flock has blatantly violated these limits, imposing minimal restrictions on nationwide access to California ALPR data. More recently, Flock has taken steps to mimic compliance with California law, which it violated on a massive scale—sometimes with its law enforcement customers' acquiescence, and sometimes without their knowledge. Flock could easily implement policies and design its system in compliance with the ALPR Privacy Act; indeed, it is legally required to do so. But Flock has instead pressed its customers to illegally share information about California drivers' daily movements. Meanwhile, Flock has openly disclaimed its duty to prevent unlawful information sharing. Flock has repeatedly and publicly disclaimed any responsibility for violations of the ALPR Privacy Act, instead blaming its customers for any violations. In so doing, Flock has ignored its duties under California law.

Plaintiffs Daniel Javorsky, Anthony Mayor, Brendan Whitney, Larissa Cursaro, Salvador Carnero, Timothy Aumiller, Phylicia Applewhite, Ryan Smith, Sean Arend, and Kyle Jordan

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

bring this Class Action Complaint against Flock individually and on behalf of all others similarly situated, and allege upon personal knowledge and their counsel's investigations as follows:

### NATURE OF THE CASE

1.      Flock has created an Orwellian mass-surveillance infrastructure that is practically impossible to avoid, particularly for anyone operating a vehicle in the towns and cities across the country where Flock has installed its cameras. Flock violates California law by amassing and sharing data on California drivers with out-of-state and federal law enforcement agencies. Flock attempts to evade responsibility and shift liability for its violations by pointing fingers at its own customers.[1] But Flock cannot rely on weaponized incompetence when its obligations under California law are clear.

2.      Flock's ALPR technology captures, analyzes, and shares vehicle data, including a vehicle's license plate number, often paired with any distinguishing features. Flock aggregates and permits its customers to search this data, which reveals the vehicle's location and movements over time. Flock markets itself as an end-to-end "safety-as-a-service" business.[2] It manufactures, owns, and operates ALPR cameras. And Flock also creates, maintains, and controls data warehouses, web interfaces, and applications that enable its customers to access and analyze ALPR data gathered by other customers.

3.      Flock operates ALPRs nationwide, including thousands of devices throughout California.[3] More than 200 California law enforcement agencies use Flock's ALPR data.[4]

---

[1] Aaron Mak, *The CEO of Flock downloads on his surveillance cameras*, POLITICO (Dec. 22, 2025), https://www.politico.com/newsletters/digital-future-daily/2025/12/22/the-ceo-of-flock-downloads-on-his-surveillance-cameras-00703165 (In an interview, Flock's CEO is reported to have said, "[Flock] built a product that allows communities to put safeguards into the product.")
[2] Frequently Asked Questions: Why can't I buy Flock Safety cameras?, FLOCK SAFETY, https://www.flocksafety.com/faq [https://perma.cc/L4MU-CVPW] (last visited Feb. 22, 2026).
[3] *See ALPR Map*, DEFLOCK, https://deflock.me/map (last visited April 2, 2026).
[4] Rachel Myrow, *California Cities Double Down on License-Plate Readers as Federal Surveillance Grows*, KQED (Dec. 18, 2025), [hereinafter Rachel Myrow, *California Cities Double Down*], https://www.kqed.org/news/12066989/california-cities-double-down-on-license-plate-readers-as-federal-surveillance-grows (last updated Dec. 18, 2025, at 12:30 PT).

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

4.    Flock places high-definition cameras in fixed, high-traffic locations, creating a "digital neighborhood watch" that records the time and location of any vehicle that passes by, including the license plate number, along with vehicle characteristics such as make, color, and distinguishing features.

5.    While the California Legislature recognizes the benefits ALPR technology can provide to law enforcement agencies, it also recognizes that ALPR technology can invade personal privacy and harm civil liberties.

6.    California's ALPR Privacy Act[5] explicitly prohibits California law enforcement agencies and Flock from sharing California ALPR data with federal agencies or out-of-state law enforcement agencies. It also requires Flock to ensure its California customers use ALPR information only for authorized purposes and maintain reasonable security measures to prevent unauthorized access and use. Flock has blatantly violated these requirements for the California entities using its products and services.

7.    Flock's business practices flout California law. These practices include maintenance of a "national network" that aggregates data from Flock databases across the country and makes this information available to state and federal law enforcement nationwide.

8.    In fact, Flock explicitly advertises its interconnected, nationwide network of ALPR data as a coveted product feature to potential customers. Its website invites agencies to tap into "the nation's largest crime-solving LPR network," which collects more than 20 billion license plate reads from across the country every month.[6]

---

[5] Throughout this Complaint, "the ALPR Privacy Act" will refer to the laws codified in Cal. Civ. Code §§1798.90.5 *et seq*.

[6] License Plate Readers (LPR): Stop Crime in Its Tracks with Evidence That Drives Action, FLOCK SAFETY [hereinafter Flock License Plate Readers], https://www.flocksafety.com/products/license-plate-readers [https://perma.cc/RZU8-K5HG] (last visited Feb. 20, 2026); National LPR Network: Real-Time Vehicle Leads, Nationwide, FLOCK SAFETY [hereinafter Flock National LPR Network], https://www.flocksafety.com/products/national-lpr-network [https://perma.cc/PL36-XJVM] (last visited Feb 20, 2026).

3

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

9. Across California, out-of-state and federal agency sharing is pervasive. For example, Flock allowed law enforcement agencies outside of California to search the San Francisco Police Department's ALPR database more than 1.6 million times between August 2024 and February 2025.[7] Likewise, Flock allowed agencies from 48 other states to search the Los Altos, California database over a million times in 2024 and 2025.[8] And Flock shares El Cajon's ALPR network data with over 300 out-of-state law enforcement agencies, including those in Alabama, Minnesota, Ohio, and Texas.[9]

10. Flock blatantly ignores the ALPR Privacy Act and its clear and intentional restrictions on ALPR data sharing, so much so that its own customers are often unaware that their data is being shared with out-of-state and federal agencies. The Mountain View Police Department ("MVPD"), for example, only recently discovered, after being prompted to respond to ALPR Privacy Act-enabled public records requests, that federal agencies accessed its cameras' data through a nationwide search tool and that this feature was "enabled without MVPD's permission or knowledge."[10]

11. Sometimes, Flock persists in sharing ALPR data in violation of the ALPR Privacy Act, even when an agency has explicitly requested otherwise. The Los Altos Police Department, for example, found that Flock somehow allowed at least one federal agency to search its database even after specifically configuring Flock system settings to prohibit out-of-state and federal sharing.[11]

---

[7] Tomo Chien, *SFPD let Georgia, Texas cops illegally search city surveillance data on behalf of ICE*, S.F. STANDARD (Sept. 8, 2025, at 6:00 AM PT) [hereinafter Chien, *Georgia, Texas cops illegally search*], https://sfstandard.com/2025/09/08/sfpd-flock-alpr-ice-data-sharing.

[8] *ALPR Updated Analysis Sept. 2025*, LOS ALTOS FOR REPRESENTATION AND EQUITY (Sept. 2025), https://www.lare.org/alpr-updated-analysis.

[9] El Cajon CA PD Transparency Portal, FLOCK SAFETY, [hereinafter El Cajon Transparency Portal], https://transparency.flocksafety.com/-el-cajon-pd-ca (last accessed Apr. 2, 2026).

[10] Katie Debenedetti, *As California Cities Grow Wary of Flock Safety Cameras, Mountain View Shuts Its Off,* KQED [hereinafter Debenedetti, *California Cities Grow Wary*] (Feb 3, 2026), https://www.kqed.org/news/12072077/as-california-cities-grow-wary-of-flock-safety-cameras-mountain-views-shuts-its-off.

[11] *ALPR Updated Analysis Sept. 2025*, *supra* note 8.

4

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

12.     As Flock continues to violate the ALPR Privacy Act, some California cities are rethinking their partnerships with Flock.[12] Numerous other municipalities have begun to opt out of using Flock and its services altogether. In recent months, the cities of Santa Cruz, Richmond, Mountain View, South Pasadena, and Los Altos Hills all shut down Flock cameras or terminated their contracts.[13]

13.     As part of a lawsuit to stop the El Cajon Police Department from permitting Flock's illegal information sharing, the California Attorney General stated: "When information about Californians leaves the state, we no longer have any say over how it is used or shared. That's why the California Legislature passed the ALPR Privacy Act — to ensure information about Californians remains here in California." "California law prohibits the sharing of license plate data with federal and out-of-state agencies" and doing so "jeopardizes the privacy and safety of individuals in its community."[14]

---

[12] *See, e.g.*, Brandon Pho, *Santa Clara County cities weigh ending Flock Safety contracts over ICE access*, LOCAL NEWS MATTERS (Feb. 3, 2026), https://localnewsmatters.org/2026/02/03/silicon-valley-flock-safety-license-plate-readers-ice/; Eli Wolfe, *Flock license plate scanner contract postponed by Alameda County leaders*, THE OAKLANDSIDE (Feb. 11, 2026) [hereinafter Wolfe, *Flock Contract Postponed*], https://oaklandside.org/2026/02/11/flock-contract-alameda-county-ice-federal/.

[13] Rachel Myrow, *Santa Cruz the First in California to Terminate Its Contract With Flock Safety*, KQED (Jan. 14, 2026), https://www.kqed.org/news/12069705/santa-cruz-the-first-in-california-to-terminate-its-contract-with-flock-safety; Drew Penner, *Los Gatos officials debate license plate readers, after Santa Cruz, Los Altos Hills jettison Flock Safety service*, LOS GATAN (Jan. 28, 2026), https://losgatan.com/los-gatos-officials-debate-license-plate-readers-after-santa-cruz-los-altos-hills-jettison-flock-safety-service/; Debenedetti, *California Cities Grow Wary*, *supra* note 10; Libby Rainey, *South Pasadena cancels contract with Flock Safety, citing privacy concerns*, LAIST (Mar. 19, 2026), https://laist.com/news/south-pasadena-cancels-flock-safety-contract-privacy-concerns. The consequences of Flock's privacy violations and breaches of trust don't stop at California's borders, either—cities across the country, citing privacy and safety concerns, are suspending or canceling their Flock contracts. *See, e.g.*, Aurora Berry, *Ithaca Common Council votes to end contract with Flock Safety*, WKSG (Mar. 4, 2026) (Ithaca, NY); Joel Moreno, *Washington cities face financial questions after pausing Flock camera contracts*, KATU2 (Mar. 4, 2026), https://katu.com/news/local/washington-cities-face-financial-questions-after-pausing-flock-camera-contracts-grant-taxpayer-immigration-ice-dhs-federal-privacy-concerns-identification-license-plate-seattle-redmond-lynnwood-protest-community (last updated Mar. 18, 2026) (Redmond, Lynnwood, Everett & Mountlake Terrace, WA).

[14] Press Release, Off. of the Att'y Gen., Cal. Dep't of Just., Attorney General Bonta Sues El Cajon for Illegally Sharing License Plate Data with Out-of-State Law Enforcement (Oct. 3, 2025),

5

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

14.     Flock has shown complete and continued disregard for California law. Plaintiffs now bring this class action lawsuit alleging violations of the ALPR Privacy Act, California's Unfair Competition Law, and California Constitutional and common law, and requesting damages and injunctive relief.

**PARTIES**

15.     Plaintiff Daniel Javorsky is a natural person and a citizen of the State of California. Plaintiff Javorsky resides in San Francisco, California.

16.      Plaintiff Anthony Mayor is a natural person and a citizen of the State of California. Plaintiff Mayor resides in San Rafael, California.

17.     Plaintiff Brendan Whitney is a natural person and a citizen of the State of California. Plaintiff Whitney resides in Fresno, California.

18.     Plaintiff Larissa Cursaro is a natural person and a citizen of the State of California. Plaintiff Cursaro resides in Berkeley, California.

19.     Plaintiff Salvador Carnero III is a natural person and a citizen of the State of California. Plaintiff Carnero resides in Hayward, California.

20.     Plaintiff Timothy Aumiller is a natural person and a citizen of the State of California. Plaintiff Aumiller resides in Oakland, California.

21.     Plaintiff Phylicia Applewhite is a natural person and a citizen of the State of California. Plaintiff Applewhite resides in El Cajon, California.

22.     Plaintiff Ryan Smith is a natural person and a citizen of the State of California. Plaintiff Smith resides in San Francisco, California.

23.     Plaintiff Sean Arend is a natural person and a citizen of the State of California. Plaintiff Arend resides in Sunnyvale, California.

24.     Plaintiff Kyle Jordan is a natural person and a citizen of the State of California. Plaintiff Jordan resides in Santa Cruz, California.

https://oag.ca.gov/news/press-releases/attorney-general-bonta-sues-el-cajon-illegally-sharing-license-plate-data-out.

6

25. Defendant Flock Group, Inc. d/b/a Flock Safety is a corporation formed under the laws of Delaware. It is headquartered in Atlanta at 1160 Howell Mill Road NW, Suite 210 in Fulton County, Georgia.

## JURISDICTION AND VENUE

26. This matter was originally filed in the California Superior Court for the County of San Francisco, which has original jurisdiction over the matters alleged in this Complaint pursuant to the California Constitution, Art. VI, § 10.

27. Flock removed this case to the Northern District of California, which also has jurisdiction over this controversy under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million exclusive of interest and costs, there are over 100 putative Class Members, and numerous Class Members (including all Plaintiffs) are citizens of a different state than Defendant.

28. Both this Court and San Francisco Superior Court have personal jurisdiction over Flock because Flock Group, Inc. is licensed to do business in California, regularly conducts business in California, and purposefully collects the ALPR data of California residents and other drivers within California. Flock also markets and sells its products to California customers. Flock, therefore, has sufficient minimum contacts such that exercising personal jurisdiction over it comports with traditional notions of fair play and substantial justice. Indeed, Flock has numerous contracts with California law enforcement agencies (and other entities in California, including municipalities and private organizations like malls and homeowners' associations). Additionally, Flock has thousands of cameras located in California, which it uses to take billions of license plate scans of California vehicles, and regularly interacts with California law enforcement agencies. Plaintiffs' claims arise out of and relate to Flock's California contacts.

29. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from this District. Venue is also proper in this Court pursuant to 28 U.S.C. §§ 84(a) and 1441(a), because this "district and division embrac[e]" San Francisco County, where

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

the Complaint was initially filed. Accordingly, under Local Rule 3-2, this matter should be assigned to the San Francisco Division.

## FACTUAL ALLEGATIONS

### I.    ALPR Cameras and California's ALPR Privacy Act

30.    Modern ALPR technology uses specialized cameras and software to automatically scan, record, and convert vehicle license plates into digital data.[15] These systems are typically mounted onto local infrastructure and scan the license plate of every passing vehicle. While each camera captures one point in time, the data from each camera is merged to track and map a vehicle's movements across entire regions at all hours of the day, every day of the year. The ALPR cameras capture images of license plates, using AI and Optical Character Recognition (OCR) to convert the images into machine-readable text in real time.

31.    In 2015, the California Legislature enacted the ALPR Privacy Act to mitigate ALPR systems' risks to privacy and initiated strict requirements on operators and users of ALPR surveillance. The legislature noted that by aggregating license plate numbers with specific locations and timestamps, operators can reconstruct a person's exact location and day-to-day patterns:

> The collection of a license plate number, location, and time stamp over multiple time points can identify not only a person's exact whereabouts but also their pattern of movement. Unlike other types of personal information that are covered by existing law, civilians are not always aware when their ALPR data is being collected. One does not even need to be driving to be subject to ALPR technology: A car parked on the side of the road can be scanned by an ALPR system. This bill will put in place minimal privacy protections by requiring the establishment of privacy and usage protection policies for ALPR operators and end-users.[16]

---

[15] ALPR camera technology is distinguishable from a standard traffic camera. Traffic cameras only record specific violations at a single point in time, such as speeding on a stretch of road or running a red light at an intersection. In contrast, ALPRs are always recording, documenting, and uploading information into a centralized data store. Thus, ALPRs capture all vehicles that pass by ALPR cameras through a city or region. *See* Mario Lotmore, *Somebody's watching me: Flock versus red light cameras in Lynnwood*, LYNNWOOD TIMES (Nov. 10, 2025), https://lynnwoodtimes.com/2025/11/10/red-light.

[16] S. Comm. on Transportation and Housing, Bill Analysis, SB 34, ¶ 3 (2015).

8

32.     ALPR surveillance occurs almost exclusively without drivers' knowledge because it targets both active drivers and stationary vehicles parked on public streets in view of Flock technology. Flock has specifically ignored the ALPR Privacy Act's strict operator requirements.

33.     The ALPR Privacy Act mandates that *both* the "operators" of commercial ALPR technology like Flock and its California "end-users" and customers (e.g., law enforcement departments and private businesses) adhere to five fundamental requirements:[17]

    a.  **The Security Requirement:** Both ALPR operators and end-users must "maintain reasonable security procedures and practices, including operational, administrative, technical, and physical safeguards, to protect ALPR information from unauthorized access, destruction, use, modification, or disclosure." Cal Civ. Code § 1798.90.51(a); *id*. § 1798.90.53(a).

    b.  **The Privacy Requirement:** Both ALPR operators and end-users must "implement a usage and privacy policy in order to ensure that the collection, use, maintenance, sharing, and dissemination of ALPR information is consistent with respect for individuals' privacy and civil liberties." *Id*. § 1798.90.51(b)(1); *id*. § 1798.90.53(b)(1).

    c.  **The Notice Requirement:** Both ALPR operators and end-users must post the usage and privacy policy "conspicuously" on their website and include the following information:

        i.  The authorized purposes for using the ALPR system and collecting ALPR information.

        ii.  A description of the job title or other designation of the employees and independent contractors who are authorized to use or access the ALPR system, or to collect ALPR information. The policy shall identify the training

---

[17] Cal. Civ. Code § 1798.90.5.

9

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

requirements necessary for those authorized employees and independent contractors.

iii.   A description of how the ALPR system will be monitored to ensure the security of the information and compliance with applicable privacy laws.

iv.   The purposes of, process for, and restrictions on, the sale, sharing, or transfer of ALPR information to other persons.

v.   The title of the official custodian, or owner, of the ALPR system responsible for implementing this section.

vi.   A description of the reasonable measures that will be used to ensure the accuracy of ALPR information and correct data errors.

vii.   The length of time ALPR information will be retained, and the process the ALPR operator will utilize to determine if and when to destroy retained ALPR information.

*Id*. §§ 1798.90.51(b), 1798.90.53(b).

34.   Crucially, ALPR operators like Flock must also comply with two additional requirements to ensure consumer privacy and protect against unauthorized access:

a.   **The Audit Requirement.** ALPR operators must maintain a record of the times their ALPR system is accessed, whether by the operators, its employees, or an end-user. *Id*. § 1798.90.52(a). The audit trail must note the date and time of the query, the data that was queried, who queried it, and the purpose of the query. *Id*. § 1798.90.52(a).

b.   **The Proper Use Requirement.** ALPR operators must also "require that ALPR information only be used for the authorized purposes described in the usage and privacy policy . . . ." *Id*. §1798.90.52(b).

35.   California public agencies collecting ALPR data may not share ALPR data with federal agencies or out-of-state law enforcement agencies. "A public agency ***shall not*** sell, share, or transfer ALPR information, except to another public agency, and only as otherwise permitted by law." *Id*. § 1798.90.55(b) (emphasis added).

10

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

36. "Public agency" for purposes of the ALPR Privacy Act means "the state, any city, county, or city and county, or any agency or political subdivision of the state or a city, county, or city and county, including, but not limited to, a law enforcement agency." *Id*. § 1798.90.5(f).

37. The California AG has interpreted this plain text of the ALPR Privacy Act (including, crucially, §§ 1798.90.5(f) & 1798.90.55(b)) as permitting sharing of ALPR data only with other California state and local agencies.

38. The California AG emphasized:[18]

Importantly, the definition of 'public agency' is limited to state or local agencies, including law enforcement agencies, and does not include out-of-state or federal law enforcement agencies. (See Civ. Code, § 1798.90.5, subd. (f).) Accordingly, [the ALPR Privacy Act] does not permit California LEAs [Law Enforcement Agencies] to share ALPR information with private entities or out-of-state or federal agencies, including out-of-state and federal law enforcement agencies. This prohibition applies to ALPR database(s) that LEAs access through private or public vendors who maintain ALPR information collected from multiple databases and/or public agencies.[19]

39. Likewise, the California AG has clarified that, under the ALPR Privacy Act, "ALPR operators [like Flock] . . . must develop a usage and privacy policy, which must be conspicuously posted on their website, and must contain provisions designed to 'protect ALPR information from unauthorized access, destruction, use, modification, or disclosure.'"[20]

40. The ALPR Privacy Act contains no exceptions that would permit sharing ALPR data collected in California with federal or out-of-state agencies for any purpose. Consistent with the California AG's interpretation of the ALPR Privacy Act, any such sharing is clearly prohibited by the Act's plain text.

41. An individual harmed by a violation of the ALPR Privacy Act—"including, but not limited to, unauthorized access or use of ALPR information or a breach of security of an ALPR

[18] John D. Marsh, Div. of L. Enf't, Cal. Dep't of Just., Info Bull. 2023-DLE-06, California Automated License Plate Reader Data Guidance (Oct. 27, 2023), https://oag.ca.gov/system/files/media/2023-dle-06.pdf.
[19] *Id*.
[20] *Id*.

11

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

system"—may bring a civil suit "against a person who knowingly caused the harm" and recover (1) actual damages, but not less than liquidated damages in the amount of $2,500, (2) punitive damages upon proof of willful or reckless disregard of the law, (3) reasonable attorney's fees and other litigation costs reasonably incurred, and (4) other preliminary and equitable relief as the court determines to be appropriate. *Id*. § 1798.90.54.

42.    Here, Flock has knowingly been in violation of the ALPR Privacy Act since its enactment in 2015, and its violations are made more egregious by its proprietary technologies described below.

## II.    **Flock's ALPR Cameras and Software Amass, Analyze, and Interpret Massive Amounts of Data, Creating Detailed Vehicle Profiles and Histories in Violation of California Law**

43.    In the decade since the ALPR Privacy Act was enacted, ALPR camera technology has become more sophisticated, as have the software and algorithms that companies like Flock use to analyze and organize that data. One of the primary shifts between historical and modern ALPR technology is the transition from merely capturing static images of license plates to conducting real-time analysis and extensive tracking of license plates and vehicles.

44.    Flock captures vehicle data and identifies automobiles through an integrated system of hardware, artificial intelligence, and cloud computing that goes far beyond just collecting license plates.

45.    Advancements in camera technology have allowed for the widespread proliferation of ALPR cameras. Flock's ALPR system alone now includes tens of thousands of cameras nationwide.

46.    Flock's most popular products, the "Falcon" and the "Sparrow," are ALPR cameras that monitor driving activity and photograph all passing vehicles.

12

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

47.     The below images from Flock's website show typical examples of Flock ALPR cameras mounted on existing traffic poles or on their own freestanding poles with their solar power sources.

 

48.     Flock's ALPR cameras are motion-activated.[21] When a Flock ALPR camera detects motion, it snaps pictures of what is in view, each time stamped and tagged with precise GPS coordinates.

49.     Flock uses OCR software to isolate vehicle license plates from the images and converts them into machine-readable text, i.e., the plate number. Flock ALPR cameras capture at least the following information:[22]

      a.  License plate image;

      b.  Vehicle image;

      c.  Vehicle characteristics (e.g., color, make, other vehicle attributes);

      d.  License plate number;

      e.  License plate state;

      f.  Date;

      g.  Time; and

---

[21] About Flock Safety: Frequently Asked Questions, FLOCK SAFETY, https://www.bristolri.gov/DocumentCenter/View/892/Flock-Safety-Media-FAQs-2-1-1 (last accessed Apr. 3, 2026).

[22] License Plate Reader Policy, FLOCK SAFETY [hereinafter Flock LPR Policy], https://www.flocksafety.com/legal/lpr-policy [https://perma.cc/8CPY-TADR] (last updated Nov. 13, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

h. Camera location.

50. Other vehicle attributes may include bumper damage or a roof rack, as seen in the following image on Flock's website.[23] Flock cameras even capture images of bicyclists, even though bicycles don't have license plates.[24]



51. Flock transmits these images and extracted information to its cloud servers. Once in the cloud, Flock then cross-checks the plate number against official state and law enforcement databases and feeds the ALPR data into a myriad of algorithms and tools to provide its customers with an ever-growing trove of information.

---

[23] The image is taken from Flock's website. ("roof rack" as an example is from the Flock Evidence Policy. *See* Flock Evidence Policy, FLOCK SAFETY, https://www.flocksafety.com/legal/flock-evidence-policy [https://perma.cc/74YF-XNYN] (last updated January 9, 2026)).

[24] Frequently Asked Questions: What kind of vehicles can a Flock Safety camera identify?, FLOCK SAFETY, https://www.flocksafety.com/faq [https://perma.cc/L4MU-CVPW] (last visited Feb. 21, 2026); Here's the Data Police Actually Get from Traditional License Plate Reading Systems, FLOCK SAFETY (Mar. 28, 2019), https://www.flocksafety.com/blog/heres-the-data-police-actually-get-from-traditional [https://perma.cc/HT32-3JXD].

14

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

52.     Flock uses images of a vehicle to generate its "Vehicle Fingerprint,"[25] which creates a unique profile for the vehicle so it can be quickly identified if it is captured on camera in the future. Relying solely on this Vehicle Fingerprint, Flock can even identify vehicles with no license plate or temporary paper tags.[26]

53.     Flock also uses the images captured by its cameras to train the AI models and software systems that power many of its products.[27]

54.     Flock's FreeForm product allows customers to search for vehicles using natural language if they don't have a license plate number to search. For example, a user could search for "red pickup truck with a dog in the bed," to find any red pickup trucks carrying a dog.[28] Flock's powerful tools allow its customers to search for cars and people using granular details.

55.     Flock's "Investigations Manager" tool[29] proactively analyzes movement patterns and related data to flag potentially "suspicious" vehicles. It identifies vehicles that tend to move together and labels the cars and affiliated individuals as "suspect networks." In marketing materials for Investigations Manager, Flock "urges police departments to 'Maximize [their] LPR data to detect patterns of suspicious activity across cities and states.'"[30]

56.     Flock also touts its AI-powered [1] "Multi-State Insights feature," which alerts law enforcement "when suspect vehicles have been detected in multiple states"; [2] "Linked Vehicles"

---

[25] *6 Myths About License Plate Readers and Security Systems*, FLOCK SAFETY: BLOG (May 31, 2023), https://www.flocksafety.com/blog/6-myths-license-plate-readers-security-systems [https://perma.cc/Q9WN-HJQC].

[26] *Id.*; Flock License Plate Readers, *supra* note 6 ("No Plate? No Problem. Turn images into actionable evidence – no plate required.").

[27] Privacy Policy, FLOCK SAFETY, https://www.flocksafety.com/legal/privacy-policy [https://perma.cc/7T8D-AALC] (last updated Aug. 1, 2025).

[28] Flock License Plate Readers, *supra* note 6.

[29] Investigations Manager: Connect the Dots. Close More Cases., FLOCK SAFETY, https://www.flocksafety.com/products/investigations-manager [https://perma.cc/YTP9-AVER] (last visited Feb. 20, 2026).

[30] Jay Stanley, *Surveillance Company Flock Now Using AI to Report Us to Police if It Thinks Our Movement Patterns Are "Suspicious"*, ACLU: NEWS & COMMENTARY (Aug. 7, 2025), [hereinafter Jay Stanley, *"Suspicious" Movement Patterns*] https://www.aclu.org/news/national-security/surveillance-company-flock-now-using-ai-to-report-us-to-police-if-it-thinks-our-movement-patterns-are-suspicious.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

or "Convoy Search," which allows law enforcement to "uncover vehicles frequently seen together," thus tracking people's associations; and [3] a "Multiple locations search," which aims to "[u]ncover vehicles seen in multiple locations."[31]

57.    From a single set of vehicle images, Flock thus creates detailed, searchable, and dangerously actionable data records that extend far beyond just a license plate number.

58.    The below image from a Flock presentation demonstrates the type of information Flock records and deduces, including that the SUV belongs to a "non resident" and was "[s]een three times in the last 30 days."



59.    Flock's high-end but inexpensive tools and the associated databases Flock has created grant law enforcement agencies across the country instant access to shared data from tens of thousands of cameras—exactly the kind of practice the ALPR Privacy Act regulates.

60.    An individual Flock camera can photograph thousands of cars per day; for example, Oak Park, Illinois' eight Flock cameras took over 300,000 scans monthly in the 2022 to 2023 timeframe.[32]

---

[31] *Id.*

[32] *84% of drivers stopped by Oak Park police in Flock traffic stops were Black*, FREEDOM TO THRIVE OAK PARK: BLOG (Apr. 16), https://www.freedomtothriveop.com/blog/84-of-the-drivers-stopped-by-oak-park-police-in-a-flock-traffic-stops-were-black (last visited Jan. 2, 2026).

16

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

61. Over 200 California law enforcement agencies collect and use images captured by Flock ALPR cameras.[33]

62. The Los Angeles County Sheriff's Department alone operates 476 Flock ALPR cameras.[34]

63. Collectively, the San Francisco and Oakland Police Departments also operate hundreds of Flock cameras.[35]

64. The maps below show the distribution of Flock ALPR cameras throughout the San Francisco Bay Area.[36]



---

[33] Rachel Myrow, *California Cities Double Down*, *supra* note 4.

[34] Rebecca Ellis, *L.A. County moves to keep ICE away from data that show where people drive*, L.A. TIMES (Sept. 17, 2025, at 3:00 PT), https://www.latimes.com/california/story/2025-09-17/la-county-ice-license-plate-data.

[35] Tomo Chien, *SF, Oakland cops illegally funneled license plate data to feds*, S.F. STANDARD (July 14, 2025, at 6:00 PT) [hereinafter Chien, *SF/Oakland ICE LPRs*], https://sfstandard.com/2025/07/14/oakland-san-francisco-ice-license-plate-readers/.

[36] *See ALPR Map*, DEFLOCK, https://deflock.me/map (last visited April. 2, 2026).

17

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG





FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

65.     Flock boasts that over 4,800 law enforcement agencies nationwide use its cameras and it claims to collect 20 billion plate reads per month.[37] Flock prides itself on having the nation's largest fixed ALPR network. "With billions of monthly plate reads, Flock connects communities, businesses and law enforcement in a shared network[.]"[38]

66.     Likewise, Flock's investors recognize the value of Flock achieving such widespread adoption:

> What magnifies the power of Flock Safety even more is that the digital evidence can be pooled across different law enforcement agencies for a short period of time, making it more powerful as adoption scales within a community and across the U.S. more broadly. The power of Flock Safety is in its network. The more devices deployed, the more evidence there is to solve crimes.[39]

67.     Consequently, Flock's ALPR system reveals "sensitive details about where individuals work, live, associate, worship, seek medical care, and travel."[40] Bypassing warrants and laws designed to protect personal liberties, Flock's ALPR system tracks, catalogues, and analyzes every turn of every driver's route, looking for "suspicious activity" to generate new business—not safer communities. As noted in recent reporting by the ACLU, each of Flock's advanced analytics and AI-powered features "are variants on the same theme: using the camera network not just to investigate based on suspicion, but to generate suspicion itself."[41]

68.     In May 2025, Flock announced the development of a new people search product ("Nova") that would integrate its ALPR systems with data broker lookups, credit-related

---

[37] Flock National LPR Network, *supra* note 6.

[38] *Id.*

[39] David Ulevitch & David George, *Announcement: Investing in Flock Safety*, ANDREESSEN HOROWITZ (July 13, 2021), https://a16z.com/announcement/investing-in-flock-safety.

[40] Letter from Jennifer Pinsof, Staff Att'y, Elec. Frontier Found.; Matt Cagle, Senior 18 Staff Att'y, ACLU Found. of N. Cal.; Mohammad Tasjar, Senior Staff Att'y, ACLU Found. of S. Cal.; & David Trujillo, Chief Program & Strategy Officer, to Att'y Gen. Rob Bonta, Off. of the Att'y Gen., Cal. Dep't of Just., at 2 (Jan. 31, 2024) [hereinafter EFF–ACLU Joint Letter], https://www.eff.org/files/2024/01/30/2024-01-31_letter_to_ag_bonta_re_sb_34_final.pdf (citing *Automatic License Plate Readers*, ELEC. FRONTIER FOUND. (Mar 29, 2023), https://sls.eff.org/technologies/automated-license-plate-readers-alprs; *You Are Being Tracked: How License Plate Readers Are Being Used to Record Americans' Movements*, ACLU (July 2013), https://www.aclu.org/you-are-being-tracked).

[41] Jay Stanley, *"Suspicious" Movement Patterns*, *supra* note 30.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

information from Equifax and TransUnion, and other external sources—even including stolen personal information from data breaches found on the dark web—to give its customers even more invasive ways to conduct warrantless surveillance.[42]

69.    At an internal meeting, a Flock employee explained "You're going to be able to access data and jump from LPR to person and understand what that context is, link to other people that are related to that person [...] marriage or through gang affiliation, et cetera," demonstrating Flock's willingness to enable even greater (and even more highly offensive) invasions of privacy in its pursuit of profit.

70.    These new additions to Flock's ALPR system mean Flock isn't merely capturing static license plate information; it is constructing complex profiles of driving behavior, including predictive behavioral profiles potentially tied to individuals, and making these advanced insights available to thousands of law enforcement agencies across the country.[43]

71.    Flock also announced the launch of "Flock Intelligence" in August 2025, an AI-powered search tool that can "search[] multiple databases, match[] across jurisdictions, and suggest[] next investigative moves" to law enforcement. Its Night Shift tool can "crunch the data, identify matching vehicle activity, run additional searches, and hand back a ready-to-review lead list" in between an officer's shifts.[44] The introduction of Flock Intelligence raises additional questions about whether Flock has complied with California law by supposedly walling off

[42] Joseph Cox, *License Plate Reader Company Flock Is Building a Massive People Lookup Tool, Leak Shows*, 404 MEDIA (May 14, 2025), https://www.404media.co/license-plate-reader-company-flock-is-building-a-massive-people-lookup-tool-leak-shows/.

[43] *See* Jay Stanley, *"Suspicious" Movement Patterns*, *supra* note 30; Ben Miller, *Flock Safety Gives Users Expanded Vehicle Location Abilities*, GOVERNMENT TECHNOLOGY (Sept. 1, 2021), https://www.govtech.com/biz/flock-safety-gives-users-expanded-vehicle-location-abilities; *Solve Cases Faster, Cut Backlogs, and Avoid Burnout: The Power of a Smarter LPR*, FLOCK SAFETY: BLOG (Oct. 3, 2025), https://www.flocksafety.com/blog/reduce-case-backlogs-and-overtime-with-tech [https://perma.cc/SMV4-3XDU]; Rachel Levinson-Waldman & Ivey Dyson, *The Dangers of Unregulated AI in Policing*, BRENNAN CENTER FOR JUSTICE (Nov. 20, 2025), https://www.brennancenter.org/our-work/research-reports/dangers-unregulated-ai-policing.

[44] Garrett Langley, *Amplified Intelligence: What AI in Public Safety Will Actually Look Like*, FLOCK SAFETY: BLOG (Aug, 8, 2025), https://www.flocksafety.com/blog/amplified-intelligence-what-ai-in-public-safety-will-actually-look-like.

20

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

California ALPR data or if out-of-state and federal agencies can access California ALPR data through these AI tools. While law enforcement may like how Flock makes their jobs easier, the convenience to police does not justify the increasingly invasive and pervasive surveillance[45] and profiling of innocent Californians—which is highly offensive to a reasonable person.

### III. Flock Violates California Law by Sharing California ALPR Data with Out-of-State and Federal Agencies

72.    Flock's amassing of ALPR camera data, its proprietary surveillance tools, and its ability to profile and track vehicles all raise serious privacy concerns. Of equal concern is that Flock shares this sensitive information with agencies outside of California's jurisdiction, robbing California drivers of the protections afforded under the ALPR Privacy Act.

73.    While the ALPR Privacy Act explicitly prohibits California state and local agencies from sharing ALPR data with federal or out-of-state law enforcement, Flock's infrastructure and business model do just that. Flock's national network and permissive sharing tools enable and encourage out-of-state state and federal law enforcement entities like ICE and CBP to track California drivers.

74.    **The National Lookup Network:** Flock operates a national, interconnected database comprising over 80,000 cameras across the United States. A core feature of this system for subscribers is the "National Lookup" tool. This function, which Flock or its end-users can turn on, allows anyone with access to query license plate reads from any participating agency.

75.    Flock's August 2023 User Guide instructed law enforcement users that their agency could enable National Lookup, which allowed all law enforcement agencies in the country

---

[45] Flock itself admits that whether its technology can be accurately characterized as "mass surveillance" "depends on several factual questions." *See Is Flock Mass Surveillance? Here's What 30 Courts Decided* (Feb. 26, 2026) FLOCK SAFETY: BLOG, https://www.flocksafety.com/blog/does-flock-enable-mass-surveillance [https://perma.cc/Q72R-HR5C].

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

with the same feature enabled to search data obtained through that agency's Flock cameras as well, with no limitation on California law enforcement agencies.[46]

76.     Flock enabled federal law enforcement agencies, including the Department of Homeland Security's Customs and Border Control ("CBP") and Homeland Security Investigations ("HSI") to access Flock's National Lookup utility.[47] Flock never alerted its customers that federal agencies would have this access.[48]

77.     Because Flock did not restrict out-of-state law enforcement agencies' access to California ALPR data, a sheriff's department in Georgia and police departments in Illinois and Massachusetts were able to search the San Francisco Police Department's ALPR data to aid ICE investigations.[49] After reporting on Flock's widespread violations became public, Flock announced and implemented a series of technical changes, tacitly conceding that its previous practices violated the ALPR Privacy Act.[50] At the same time, however, Flock developed new ways to sidestep California law.

---

[46] Jason Koebler & Joseph Cox, *ICE Taps into Nationwide AI-Enabled Camera Network, Data Shows*, 404 MEDIA (May 27, 2025) [hereinafter Koebler & Cox, *ICE Taps into Nationwide Network*], https://www.404media.co/ice-taps-into-nationwide-ai-enabled-camera-network-data-shows (citing FLOCK SAFETY USER GUIDE AUGUST 2023, FLOCK SAFETY at 3 (2023), https://www.documentcloud.org/documents/24172417-flocksafetyuserguideaug2023).

[47] Byron Tau and Garance Burke, *Border Patrol is monitoring US drivers and detaining those with 'suspicious' travel patterns*, THE ASSOCIATED PRESS (Nov. 20, 2025), https://www.ap.org/news-highlights/spotlights/2025/border-patrol-is-monitoring-us-drivers-and-detaining-those-with-suspicious-travel-patterns/; *Does Flock Share Data with ICE?*, FLOCK SAFETY: BLOG (Jan. 6, 2026) [hereinafter *Does Flock Share Data?*, FLOCK SAFETY: BLOG], https://www.flocksafety.com/blog/does-flock-share-data-with-ice [https://perma.cc/AG84-9AQV] (stating "All federal organizations were removed from statewide and national lookup networks. Federal agencies can no longer access those search tools.").

[48] Garrett Langley, *Ensuring Local Compliance: A statement from Flock Safety*, FLOCK SAFETY: BLOG [hereinafter *Ensuring Local Compliance*] (Aug. 25, 2025), https://www.flocksafety.com/blog/ensuring-local-compliance [https://perma.cc/AR88-U768].

[49] Chien, *Georgia, Texas cops illegally search*, *supra* note 7.

[50] *Why Are Some Flock Cameras Being Removed by Cities?*, FLOCK SAFETY: BLOG (Feb. 26, 2025), https://www.flocksafety.com/blog/why-are-some-flock-cameras-being-removed-by-cities [https://perma.cc/PA5Z-8E6N] (detailing data privacy and control practices "[a]s of early 2026…").

22

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

78. Extensive investigations have concluded that Flock connected California customers' networks to the National Lookup tool and that some California agencies were themselves unaware that Flock was allowing their ALPR databases to be used in violation of the ALPR Privacy Act. For example, Bernie Escalante, Police Chief of the Santa Cruz Police Department, "said the department learned only recently that Flock's 'national search tool' had been activated in a way that improperly allowed out-of-state law enforcement agencies to search camera data from across the entire Flock network—including California agencies legally barred from sharing such information" and that "[t]hese violations were not known to the Santa Cruz Police Department and were not the result of any deliberate attempt by city staff to circumvent California law[.]"[51]

79. The Mountain View Police Department discovered in early 2026 that because National Lookup had been turned on without the department's permission, "hundreds of federal and state law enforcement agencies had accessed the city's ALPR data without the department's knowledge," including the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives offices in Kentucky and Nashville, Tennessee; Langley Air Force Base in Virginia; the U.S. GSA Office of the Inspector General; Lake Mead National Recreation Area in Nevada; and an Ohio Air Force Base.[52]

80. The Richmond Police Department also discovered that the National Lookup feature was inadvertently turned on; the Chief stated that initial training from Flock did not

---

[51] Joan Hammel, *Eyes in the Sky: Santa Cruz discloses violations involving ALPRs, launches review of camera use*, GOODTIMES (Nov. 26, 2025) [hereinafter Joan Hammel, *Eyes in the Sky*], https://www.goodtimes.sc/santa-cruz-alpr-violations-review-flock-safety; ACLU of Massachusetts, *Network Sharing Overview* (Youtube, Oct. 7, 2025), https://www.youtube.com/watch?v=S34n0_TBFgo.

[52] Carlos E. Castañeda, *Northern California police chief suspends use of ALPR cameras after outside agencies access data*, CBS NEWS (Feb. 3, 2026), https://www.cbsnews.com/sanfrancisco/news/mountain-view-alpr-cameras-use-suspended-automated-license-plate-reader/.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

disclose that this feature created a "two-way street" for data sharing. The feature was active for years without the city's knowledge.[53]

81.    In Ventura County, a recent audit found that out-of-state agencies accessed data from the Ventura County Sheriff's Office more than 364,000 times over just one month last year. This included 299 immigration-related searches. Ventura County had previously disabled the national lookup feature in 2023, but discovered in February 2026 that it had been reactivated. After an investigation, the Sheriff's Office determined that no one from their agency activated the feature. This time, Flock claimed that a "system bug" could have automatically activated National Lookup.[54]

82.    The El Cerrito and Los Altos Police Departments discovered that Flock had turned on National Lookup when the cameras were installed. The Los Altos Police Chief stated that this was "without [the Department's] knowledge or approval."[55]

83.    Flock admits that California was included in the National Lookup service and that its inclusion violated California law. On February 11, 2025, "Flock . . . notified agencies statewide that a flaw in its system architecture inadvertently allowed law enforcement agencies outside California to conduct broad searches of license-plate data" that "violated two laws," including the ALPR Privacy Act.[56]

---

[53] Mike Aldax, *Richmond council votes 4-3 to restore Flock Safety cameras*, RICHMOND STANDARD (March 18, 2026), https://richmondstandard.com/community/2026/03/18/richmond-council-votes-to-reactivate-flock-safety-cameras-under-short-term-contract/

[54] Matthew Rodriguez, *Flock license plate readers shared data with out-of-state agencies, Ventura County audit finds*, CBS NEWS (Feb. 27, 2026) [hereinafter Rodriguez, *Ventura County audit*], https://www.cbsnews.com/losangeles/news/flock-license-plate-readers-shared-data-with-out-of-state-federal-agencies/.

[55] Christina Casillas, *Los Altos Police Department doesn't plan to stray from Flock*, LOS ALTOS TOWN CRIER (Feb. 10, 2026), https://www.losaltosonline.com/news/los-altos-police-department-doesn-t-plan-to-stray-from-flock/article_50a364f1-6c83-48b9-b3ea-6eeffbeb5d03.html; El Cerrito Police, *El Cerrito Police Issue Statement on Flock License Plate Reading System*, CONTRA COSTA NEWS (Feb. 27, 2026), https://contracosta.news/2026/02/27/el-cerrito-police-issue-statement-on-flock-license-plate-reading-system/.

[56] Joan Hammel, *Eyes in the Sky*, *supra* note 51.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

84. Sometime between March and June 2025, Flock updated its product feature and purported to have removed all California agencies and their ALPR information from the National Lookup service.

85. Flock's senior director of communications stated that, "[t]o help every agency stay in compliance, Flock disabled the National Lookup feature for all California agencies (in March 2025)."[57]

86. In a June 19, 2025, blog post, Flock CEO and Co-Founder Garrett Langley wrote, "Some states, like California, do not allow any sharing across state borders. For those states, Flock has disabled National Lookup to make compliance easier."[58] This makes clear that Flock was always capable of complying with California law, including the ALPR Privacy Act. It just didn't want to.

87. But the damage was already done. These violations of law and trust have led multiple localities to cut ties with Flock.[59] In January 2026, the Santa Cruz City Council voted near-unanimously to terminate its contract with Flock, "citing rising tensions with ICE, and weak trust in the company following Flock's lackluster response to the data breaches."[60]

88. Santa Cruz City Councilmember Susie O'Hara stated: "Flock has made too many mistakes and Flock's leadership has too often dismissed real, valid concern instead of responding with transparency and accountability . . . . We need a partner who can take criticism seriously and redirect course."[61]

---

[57] Christina Casillas, *Los Altos Police Department doesn't plan to stray from Flock*, LOS ALTOS TOWN CRIER (Feb. 10, 2026), https://www.losaltosonline.com/news/los-altos-police-department-doesn-t-plan-to-stray-from-flock/article_50a364f1-6c83-48b9-b3ea-6eeffbeb5d03.html.
[58] Garrett Langley, *Setting the Record Straight: Statement on Flock Network Sharing, Use Cases, and Federal Cooperation*, FLOCK SAFETY: BLOG (June 19, 2025), https://www.flocksafety.com/blog/statement-network-sharing-use-cases-federal-cooperation [https://perma.cc/4FSG-8YFT].
[59] *See supra,* note 13.
[60] B. Sakura Cannestra, *Santa Cruz leaders vote to terminate contract with Flock*, SANTA CRUZ LOCAL (Jan. 13, 2026), https://santacruzlocal.org/2026/01/13/santa-cruz-leaders-vote-to-terminate-contract-with-flock/.
[61] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

89.     More recently, leaders in Santa Clara County, California, effectively cut ties with Flock. One Supervisor stated that "Flock is a problematic company, and their reported conduct and sharing of private data is incompatible with our county's values, my personal values and the values that I promised the voters of District 2 that I would uphold . . ."[62]

90.     Flock's technical changes still do not bring Flock into compliance with the ALPR Privacy Act, though: Flock's systems *still* permit California ALPR data to be shared and accessed by out-of-state and federal law enforcement in many different ways, some of which are detailed below.

91.     **1:1 Sharing:** Law enforcement agencies using Flock can enter into so-called 1:1 agreements with other agencies to share ALPR data. Flock makes this possible by allowing any law enforcement agency to "request" access from another agency directly through the Flock platform. An agency may grant such requests individually or in bulk through the click of a button, and sometimes even automatically.[63]

92.     Flock's software has resulted in out-of-state and federal data sharing in violation of the ALPR Privacy Act.[64] Attorney General Rob Bonta recently sent letters to 20 California law enforcement agencies to inform them that the their system's ALPR data was shared with federal and/or out-of-state law enforcement agencies. The departments' responses, said Attorney General

---

[62] Jospeh Geha, *Santa Clara County Leaders Cut Out Flock Safety in New Surveillance Policy*, KQED (Feb, 25, 2026), https://www.kqed.org/news/12074467/santa-clara-county-leaders-cut-out-flock-safety-in-new-surveillance-policy.

[63] Gideon Epstein, *Flock Gives Law Enforcement All Over the Country Access to Your Location*, ACLU of Massachusetts (October 7, 2025), https://data.aclum.org/2025/10/07/flock-gives-law-enforcement-all-over-the-country-access-to-your-location/.

[64] Spencer Soicher, *Flock admits federal immigration agents have direct access to tracking data, despite previous claims*, 9NEWS (August 19, 2025)[hereinafter Soicher, *Direct access to tracking data*], https://www.9news.com/article/news/local/flock-federal-immigration-agents-access-tracking-data/73-a8aee742-56d4-4a57-b5bb-0373286dfef8?; Jason Koebler, *CBP Had Access to More than 80,000 Flock AI Cameras Nationwide*, 404 Media (August 25, 2025) [hereinafter Koebler, *80,000 Flock AI Cameras*], https://www.404media.co/cbp-had-access-to-more-than-80-000-flock-ai-cameras-nationwide/.

26

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

Bonta, indicated that the sharing was a surprise—"It seemed like it wasn't voluntary. It was unwittingly."[65]

93.     In May of 2025, Flock entered into a memorandum of understanding with the United States Border Patrol, providing the agency with a Flock account. Flock did not inform any of its law enforcement customers that it was implementing this CBP pilot program. In fact, it had assured law enforcement agency customers that Flock had no contracts with federal agencies.[66] In a blog post, Flock also admitted that it had a pilot program with Homeland Security Investigations.[67]

94.     Recently, Flock doubled down on its relationships with federal agencies. In a blog post outlining Flock's "case for principled federal cooperation," Flock CEO Garrett Langley gestured at "transparency, accountability, and respect for civil liberties," then followed up with this statement: "Certain law enforcement contracts are designated 'law enforcement sensitive' and, as a result, cannot be discussed publicly. That being said, Flock has no contracts with ICE or DHS sub agencies.'"[68]

95.     Opaque and empty assurances aside, Langley went on to state that "[e]very community that is part of the Flock ecosystem controls access to its own data, *without qualification or condition.*"[69] But as the many examples provided above indicate, Flock has repeatedly overridden local law enforcements' limits on data sharing and actively worked to evade California law through its facilitation of illegal sharing agreements.

---

[65] Martin Kaste, *Some sanctuary states discover feds mining local license plate data*, NPR (Nov. 12, 2025), https://www.npr.org/2025/11/07/nx-s1-5587724/some-sanctuary-states-discover-feds-mining-local-license-plate-data.

[66] Soicher, *Direct access to tracking data*, *supra* note 64.

[67] Langley, *Ensuring Local Compliance*, *supra* note 48.

[68] Garrett Langley, *Fewer Victims, Stronger Safeguards: The Case for Principled Federal Cooperation*, FLOCK SAFETY: BLOG (Mar. 20, 2026) [hereinafter Langley, *The Case for Principled Federal Cooperation*], https://www.flocksafety.com/blog/fewer-victims-stronger-safeguards-the-case-for-principled-federal-collaboration [https://perma.cc/GU3B-Z3FT].

[69] *Id.* (emphasis added).

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

96.     Flock claims that it no longer allows California agencies to initiate out-of-state sharing relationships. Its senior director of communications stated that Flock "[b]locked out-of-state agencies from creating data sharing relationships with California agencies (in June 2025)."[70] But data from Flock-maintained customer transparency portals says otherwise.[71] El Cajon, for example, currently maintains 1:1 sharing agreement with hundreds of out-of-state law enforcement agencies.[72]

97.     Public reporting indicates that Flock deceives many California law enforcement agencies into sharing their data far more broadly than they intend. This is because Flock's "1:1" sharing agreements do not function as simple bilateral arrangements between two agencies. Instead, Flock structures its system so that when Agency A enters into a 1:1 agreement with Agency B, Agency A's data becomes accessible not just to Agency B, but to every agency that Agency B also agreed to share with—including out-of-state and federal law enforcement. The result is that California agencies are unknowingly feeding Flock ALPR data into a vast, multi-agency surveillance network.[73]

98.     "Once a department allows another agency to access its system, the outside agency can search the data without needing approval each time."[74] Likewise, users can query multiple

---

[70] Christina Casillas, *Los Altos Police Department doesn't plan to stray from Flock*, LOS ALTOS TOWN CRIER (Feb. 10, 2026), https://www.losaltosonline.com/news/los-altos-police-department-doesn-t-plan-to-stray-from-flock/article_50a364f1-6c83-48b9-b3ea-6eeffbeb5d03.html.

[71] Henry Lee and Kayla Galloway, *CHP warns Flock over sharing of surveillance data with federal government*, FOX KTVU (Nov. 24, 2025, at 2:12 PT), https://www.ktvu.com/news/chp-warns-flock-over-sharing-surveillance-data-federal-government.

[72] El Cajon Transparency Portal, *supra* note 9.

[73] Phil Hopkins, *DOJ Claims Weak Links in California's Automated License Plate Reader Law are Local Police Departments*, LOCAL NEWS PASADENA (Oct. 6, 2025),https://localnewspasadena.com/2025/doj-claims-weak-links-in-californias-automated-license-plate-reader-law-are-local-police-departments/.

[74] Tomo Chien, *California cops are breaking surveillance laws. Who's going to stop them?*, S.F. STANDARD (July 23, 2025, at 6:00 PT) [hereinafter Chien, *California cops are breaking surveillance laws*], https://sfstandard.com/2025/07/23/california-police-sharing-flock-license-plate-data.

28

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

networks simultaneously—searches of Oakland's ALPR data, for example, were found to reach hundreds of other networks at once.[75]

99.    As another example, Flock's system shares ALPR data from Alameda County through 1:1 agreements with more than 300 out-of-state agencies in the 287(g) program, which deputizes local law enforcement to assist federal agents with immigration enforcement and deportation.[76] California legislation prohibits police from participating in this program.[77] Yet through Flock's 1:1 agreements, these agencies have searched Alameda County's data tens of thousands of times, effectively dragging Alameda County into the 287(g) program in violation of California law. Flock continues to allow programs like 287(g) access to its database for California agencies.

100.    On March 2, 2026, shortly after Plaintiffs filed their original Complaint (Case No. GCG-26-634334, filed in the Superior Court of the State of California, County of San Francisco), Flock released a blog post claiming to "take[] responsibility for" the "inadvertent sharing" by California law enforcement agencies in violation of the ALPR Privacy Act.[78]

101.    In that same blog post, Flock claimed that it "has made changes and improvements to significantly enhance agency ability to effortlessly comply with applicable laws, regulations, and community norms that govern information sharing . . . ."[79]

102.    Many of these so-called "changes and improvements" are measures Flock already purported to have in place,[80] such as removing federal agencies from statewide or national lookup networks, barring them from "discover[ing] or broadly request[ing] data sharing in California[,]"

---

[75] *Id.*

[76] Wolfe, *Flock Contract Postponed*, *supra* note 12.

[77] California Values Act, Cal. Gov. Code §§ 7284–7284.12.

[78] *Flock Implements Enhanced Guardrails Across California to Ensure Lawful and Responsible Use of LPRs*, FLOCK SAFETY: BLOG (Mar. 2, 2026), https://www.flocksafety.com/blog/flock-implements-enhanced-guardrails-across-california-to-ensure-lawful-and-responsible-use-of-lprs [https://perma.cc/3SPP-BTN2].

[79] *Id.*

[80] *Does Flock Share Data?,* FLOCK SAFETY: BLOG, *supra* note 47 (stating that Flock blocked out-of-state agencies from creating new sharing relationships with California agencies in 2025).

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

and barring California agencies from "accept[ing] or initiat[ing] sharing data out of the state or with federal agencies."[81]

103.    Flock's so-called "enhanced guardrails" do not prevent agencies from sharing California ALPR data out-of-state. An example is El Cajon's data sharing: the El Cajon Police Department's transparency portal currently shows that the Flock system shares El Cajon's ALPR data with hundreds of out-of-state law enforcement agencies.[82] And FreeForm audit logs, discussed *infra*, show that out-of-state law enforcement agencies used that tool to search El Cajon's networks as recently as January 2026.[83]

104.    Troublingly, Flock's March 20, 2026 blog post on "The Case for Principled Federal Cooperation" also suggests that Flock continues to facilitate and allow federal sharing. The post describes three "distinct" "Gates" through which a local agency may pass "in order . . . to establish a sharing relationship with federal law enforcement."[84] Flock knows that sharing California ALPR data with federal agencies for *any* reason violates California law, but it continues to enable California agencies to do just that. Instead of erecting "gates," Flock's duty under California law is to build an impermeable wall.

105.    **"Fusion" Agreements:** Flock also permits and facilitates multi-agency "fusion" agreements and data pooling. Regional fusion centers aggregate data, including ALPR information collected by Flock cameras, and share insights from the aggregated data back to the agencies.[85] Flock allows these fusion centers to maintain their own accounts and multiple agencies may agree to share their ALPR data with these in-state centers. However, Flock does not restrict

---

[81] *Id.*
[82] El Cajon Transparency Portal, *supra* note 9.
[83] *See infra* paragraphs 118-121.
[84] Langley, *The Case for Principled Federal Cooperation*, *supra* note 68.
[85] Agenda Report, CITY OF RICHMOND POLICE DEPARTMENT (Jan. 21, 2025), https://pub-richmond.escribemeetings.com/filestream.ashx?DocumentId=56204; Dave Maass, *San Francisco Police Must End Irresponsible Relationship with the Northern California Fusion Center*, ELEC. FRONTIER FOUND. (Sept. 15, 2022), https://www.eff.org/deeplinks/2022/09/san-francisco-police-must-end-irresponsible-relationship-northern-california.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

the centers from sharing this aggregated information—including the data from all California member agencies—with out-of-state and federal agencies. This again violates the ALPR Privacy Act.

106. Through these permissive 1:1, fusion, and other ALPR sharing practices, Flock grants out-of-state and federal agencies access to ALPR data collected in California.

107. **"Side-Door" Access:** Audit logs provided by Flock reveal that federal agencies have accessed Flock data from California police departments.[86] Despite Langley's emphatic claims that :"[t]here is no backdoor into Flock[,]"[87] this often occurs through side-door methods that bypass formal data-sharing agreements prohibited by the ALPR Privacy Act. A common example of this side-door method is a police officer with Flock system access running plates on behalf of a federal agent or federal agents being given login credentials for a local agency's Flock portal.

108. This is possible only because Flock designed its product to allow local police to perform lookups in Flock's ALPR system on behalf of unauthorized external users.[88] This contravenes guidance from the California AG regarding the permissible uses of ALPR data under the ALPR Privacy Act.

109. In addition to the direct sharing discussed above, Flock's system also permits ICE and CBP to frequently use California ALPR data in contravention of the ALPR Privacy Act through side-door access.

110. In April 2025, the California Highway Patrol conducted a search on behalf of ICE across 845 different California agency databases with which it had sharing agreements.[89] Given the expansive nature of Flock's settings for 1:1 agreements, this meant ICE effectively searched not just one, but 845 localities' databases in a single query.

---

[86] Chien, *California cops are breaking surveillance laws*, *supra* note 74; Wolfe, *Flock Contract Postponed*, supra note 12.
[87] Langley, *The Case for Principled Federal Cooperation*, *supra* note 68.
[88] Koebler & Cox, *ICE Taps into Nationwide Network*, *supra* note 46.
[89] Chien, *California cops are breaking surveillance laws*, *supra* note 74.

31

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

111.    The Riverside County Sheriff's Office, which has 1:1 sharing agreements with more than 300 other California Flock customers, often runs searches for "HSI," ICE's Homeland Security Investigations unit, and "CBP."[90] It continues to run ALPR searches on behalf of federal agencies despite knowing that its practice of sharing ALPR with federal agencies "violates state law."[91] Flock's 1:1 agreement sharing settings means that any one of these searches exposed hundreds of California agencies—and millions of California drivers—to CBP and ICE surveillance in violation of California law.

112.    An investigation by the San Francisco Standard found that San Francisco and Oakland police officers also repeatedly violated the ALPR Privacy Act both by running searches on behalf of the FBI and other federal agencies, and by maintaining 1:1 sharing agreements with other California agencies acting on behalf of federal agencies.[92]

113.    Likewise, the Los Angeles Police Department, as well as Sheriff's Departments in Los Angeles, San Diego, and Orange Counties, all have searched license plate readings contained in Flock's database on behalf of ICE and CBP.[93]

114.    **Ineffective, Faulty Settings:** Even when Flock's customers have explicitly requested that Flock prevent California ALPR information from being shared with out-of-state or federal agencies, Flock lacks effective, reliable guardrails.

115.    When the El Cerrito Police Department discovered that their Flock system had been set up in 2023 to permit national searches, they limited access to the data to in-state searches only. Still, the department found searches from the U.S. Postal Inspection Service and the U.S. Department of Veterans Affairs Police in 2023 and 2025—after their settings had been changed.

---

[90] Khari Johnson and Mohamed Al Elew, *California police are illegally sharing license plate data with ICE and Border Patrol*, CAL MATTERS (June 13, 2025) [hereinafter Johnson & Al Elew, *California police illegally sharing*], https://calmatters.org/economy/technology/2025/06/california-police-sharing-license-plate-reader-data/.

[91] Chien, *California cops are breaking surveillance laws*, *supra* note 74.

[92] Chien, *SF/Oakland ICE LPRs*, *supra* note 35.

[93] Johnson & Al Elew, *California police illegally sharing*, *supra* note 90.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

Flock's excuse this time was that "early settings" and "misidentif[ication]" permitted these searches.[94]

116.    The Los Altos Police Department also turned off federal sharing when it was discovered in March 2025. But officers later discovered that a federal agency had nonetheless since accessed their network. Los Altos also discovered that several in-state agencies were accessing their data despite not being on the list of agencies they had shared it with. Flock told the department that a "statewide" sharing setting was turned on, which the Los Altos Police Department had not approved.[95] These agencies did not appear in the list of agencies the department shares with on the department's Transparency Portal.[96]

117.    When Ventura County Sheriff's Office discovered that National Lookup had been turned on without the Office's permission, Flock told the Sheriff's Office that "other agencies experienced similar issues" and that "due to limitations in technical logging, it was impossible to determine the specific cause."[97]

118.    **FreeForm Searching**: Flock's FreeForm tool allows users to "track down vehicles of interest using plain language descriptions."[98] This allows investigators to search by vehicle description, for example "landscaping truck" or "white F-150 with a ladder in the back."[99] Flock's AI algorithm returns image, license plate, and location data for matching vehicles.

---

[94] El Cerrito Police, *El Cerrito Police Issue Statement on Flock License Plate Reading System*, CONTRA COSTA NEWS (Feb. 27, 2026), https://contracosta.news/2026/02/27/el-cerrito-police-issue-statement-on-flock-license-plate-reading-system/.

[95] Christina Casillas, *Los Altos Police Department doesn't plan to stray from Flock*, LOS ALTOS TOWN CRIER (Feb. 10, 2026), https://www.losaltosonline.com/news/los-altos-police-department-doesn-t-plan-to-stray-from-flock/article_50a364f1-6c83-48b9-b3ea-6eeffbeb5d03.html.

[96]*ALPR Updated Analysis Sept. 2025*, *supra* note 8.

[97] Rodriguez, *Ventura County audit*, *supra* note 54.

[98] *The Future of Investigations: How Flock's New AI-Powered Tools Are Transforming Vehicular Evidence,* FLOCK SAFETY: BLOG, (Feb. 14, 2025) [hereinafter "*AI-Powered Tools*, FLOCK SAFETY: BLOG https://www.flocksafety.com/blog/the-future-of-investigations-how-flocks-new-ai-powered-tools-are-transforming-vehicular-evidence [https://perma.cc/S6NY-CP37].

[99] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

119.    Even in January 2026, out-of-state law enforcement agencies searched El Cajon's network using FreeForm. Audit logs from El Cajon show that Las Vegas Metro NV PD searched their network for "white dodge pickup with red strip on the side" on January 20, 2026. On January 12, 2026, Twin Falls ID PD searched El Cajon's network for a "Black Chevy truck with a 2026 on front plate." Other searches by these departments of El Cajon's network include "unregistered Red kia suv," "white ford f150," and "horse trailer."[100]

120.    In a screenshot on Flock's blog, a FreeForm search for "landscaping truck" returned 895,616 results.[101]



121.    These FreeForm searches make accessible—and thus share—vast amounts of California ALPR data with out-of-state entities.

---

[100]    *FreeForm Logs*, Have I Been Flocked?, https://haveibeenflocked.com/moderation-logs?sort=date_desc (last visited March 19, 2026);
[101]    *AI-Powered Tools*, FLOCK SAFETY: BLOG, *supra* note 98.

34

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

122.    **Flock's Investigative Tools:** Additional investigative tools that Flock developed and offers to its customers further flout agencies' sharing settings and agreements. Features like "Multi-State Insights" let an investigator in one state see that a vehicle of interest has traveled through other states, including California.[102] Additionally, if a California vehicle is added to a national hotlist, a Flock camera detecting it in California will generate a real-time alert[103] that is visible to any agency nationwide monitoring that hotlist.

123.    Flock could design its system to abide by California law such that the ALPR interface it provides to agencies precludes the sharing of California ALPR data with out-of-state and federal agencies everywhere. But it has not. Instead, it has taken performative steps—and only when faced with public pressure. Meanwhile, it continues to unfairly profit from the ALPR data its pervasive surveillance system collects.

**IV.    <u>Flock Violates California Law by Failing to Implement an Adequate Policy or Reasonable Security Procedures to Prevent Unlawful Information Sharing</u>**

124.    The ALPR Privacy Act requires ALPR operators like Flock to implement and maintain a policy sufficient to ensure their ALPR system will be used exclusively for permissible purposes. Cal. Civ. Code § 1798.90.52(b).

125.    Flock has an ALPR policy, which was last updated on November 13, 2025.[104]

126.    In its Terms and Conditions, Flock defines its authorized or "permitted" purpose as "legitimate public safety and/or business purpose, including but not limited to the awareness, prevention, and prosecution of crime; investigations; and prevention of commercial harm, *to the extent permitted by law.*"[105]

---

[102] *Id.*

[103]    Oakland    CA    PD    Transparency    Portal,    FLOCK    SAFETY https://transparency.flocksafety.com/oakland-ca-pd (last visited Feb. 25, 2026).

[104] Flock LPR Policy, *supra* note 22.

[105] Terms and Conditions, FLOCK SAFETY, https://www.flocksafety.com/legal/terms-and-conditions [https://perma.cc/H6L4-VK3V] (last updated Feb. 16, 2026) (emphasis added).

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

127. But by designing its ALPR system to allow out-of-state and federal agency sharing of California ALPR data, Flock violates its own authorized purpose and its own promise to abide by the laws of the states in which it operates.

128. The ALPR Privacy Act requires Flock to maintain reasonable security procedures and practices to protect ALPR information from unauthorized access. Cal. Civ. Code § 1798.90.51(a). Flock's practices, including those listed above, all allow out-of-state and federal law enforcement to access California ALPR data. But for Flock's policies, design, and infrastructure technology, California law enforcement agencies could not and would not violate the ALPR Privacy Act.

129. Flock's policies regarding whether it needs to do something as self-evident as obeying the ALPR Privacy Act are, at best, incoherent.

130. On the one hand, Flock disavows its responsibilities and insists that its customers—not Flock—are the ones who bear the onus for obeying the law. In the section of a blog post titled "Local Autonomy in working with Federal Agencies," Flock CEO Garrett Langley attempted to disclaim all responsibility for compliance with privacy laws, claiming that working with federal authorities "is a local decision. Not my decision, and not Flock's decision."

131. But Langley mischaracterizes what California law requires. The burden of compliance rests not just on law enforcement agencies but on Flock and other ALPR operators, too. The ALPR Privacy Act obligates Flock as an ALPR Operator and End User to "***ensure*** . . . compliance with applicable privacy laws," see Cal. Civ. Code. §§ 1798.90.51(b)(2)(C) & 1798.90.53(b)(2)(C) (emphasis added)—not just, as Langley put it, "to make compliance easier."

132. Flock says as much in another blog post, stating that at the company, "compliance is not an afterthought. It is foundational to how our products are built, deployed, and supported."[106]

---

[106] *Flock Aligns License Plate Reader Technology with State-Specific Legal Frameworks*, FLOCK SAFETY: BLOG (Feb. 16, 2026), https://www.flocksafety.com/blog/flock-aligns-license-plate-reader-technology-with-state-specific-legal-frameworks [https://perma.cc/6YAL-D7ZQ].

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

133. In fact, on August 25, 2025, Langley wrote that Flock's new Chief Legal Officer, Dan Haley, would lead the company's new effort "to ensure users are able to determine, in compliance with local laws, regulations, and community norms, whether and when to share their data."[107]

134. Flock published this statement shortly after Flock updated its ALPR system and placed "restrictions directly within the platform" to prevent California ALPR data from being shared with out-of-state or federal agencies pursuant to the ALPR Privacy Act.[108]

135. Flock's recent actions illustrate two important points regarding its obligations and liability under California law. First, its August 25 statement is an admission that, at the time the blog post was written, users could not ensure their compliance with local laws, and Flock was therefore not in compliance with the ALPR Privacy Act. Second, Flock's recent system updates make clear that it was *always* feasible for Flock to place reasonable limitations on use of its database to comply with California law, including the ALPR Privacy Act. It simply chose not to.

136. Flock still disclaims its statutory obligation to ensure compliance with the ALPR Privacy Act, maintaining that its "[c]ustomers choose whether to share LPR data with other customers in accordance with their laws and policies."[109] But it fails to acknowledge that the Flock platform is the means by which the illegal sharing occurs. Flock can and must build its ALPR system to abide by California law.

137. While many California law enforcement agencies were surprised to learn that their Flock systems were sharing information in violation of the ALPR Privacy Act. But others shared this information intentionally. Flock could have predicted and should have prevented these actions, particularly given the interpretative guidance from and enforcement actions by the California AG. Law enforcement agencies (in California and elsewhere) have flouted other bans

---

[107] Langley, *Ensuring Local Compliance*, *supra* note 48.
[108] *Does Flock Share Data?,* FLOCK SAFETY: BLOG, *supra* note 47.
[109] Flock LPR Policy, *supra* note 22.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

(under California law) relating to, for example, the use of facial recognition technology and the use of drones.

138.   Had Flock implemented required and reasonable measures to prevent out-of-state and federal sharing of California ALPR data, it would have complied with the ALPR Privacy Act itself as well as prevented California law enforcement agencies from violating the ALPR Privacy Act through the Flock platform. These steps would be trivial for Flock to implement.

**V.   Flock's Security Measures Fall Far Below Reasonable Procedures and Practices**

139.   Flock violates the ALPR Privacy Act further by failing to implement and maintain reasonable security procedures and practices. Its lax approach to data security has further enabled information-sharing in violation of the ALPR Privacy Act and constitute privacy violations under California law.

140.   For example, Flock does not require multifactor authentication ("MFA") when law enforcement end-users access its ALPR database. Mandating MFA—"an everyday, familiar technology"—would prevent rogue California law enforcement officers from easily sharing access credentials with their out-of-state and federal counterparts. Only after negative press coverage of a federal agency's use of a police officer's unsecured account did Flock make MFA its default setting—and even then, Flock still fails to require MFA.

141.   Predictably, failing to mandate MFA has led to "the leak of numerous police logins to Flock systems;" Flock police logins have even been found "for sale by Russian hackers in a dark web forum."[110]

---

[110] Tyler Walicek, *A Vast Camera System Now Feeds Information to Police on Drivers Across the US*, TRUTHOUT (Nov. 26, 2025), https://truthout.org/articles/a-vast-camera-system-now-feeds-information-to-police-on-drivers-across-the-us/ [hereinafter Walicek, *Vast Camera System Feeds Information*].

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

142. Security analyst, Jon "GainSec" Gaines, published a formal white paper exposing "*dozens* of security vulnerabilities"—many of which the white paper describes as "critical" in Flock's cameras, including its ALPR readers.[111]

143. Recent media reports have also revealed major configuration vulnerabilities in some models of Flock cameras that made their video feeds available on the internet for anyone, without any password or login information required. These "Condor" cameras were specifically designed to track people and operate in conjunction with Flock's ALPR cameras to provide information to law enforcement.[112]

144. A recent article provides "a sampling of some of Flock's most preposterous hardware and software issues" outlined in the GainSec white paper, noting that "[t]he porous security system of these camera systems approaches the comical":[113]

   a. **Physical vulnerabilities:** "Pressing an easily accessible button on the back of Flock cameras (which, you may recall, are mounted in public across the country) a handful of times in an extremely simple sequence will open a wireless access point, which is easily hijacked to grant root access to the camera's systems; once you have 'root,' you can connect to the device, access its video data, and install whatever you'd like. Flock cameras' exposed USB ports offer another avenue to gain control of the device to scrape data, insert fake camera feeds or anything else, obtain police information, and generally perform an endless variety of manipulations."

---

[111] Jon Gaines, *Examining the security posture of an Anti-Crime Ecosystem*, GAINSEC, (Nov. 11, 2025), accessible at *https://gainsec.com/2025/11/05/formalizing-my-flock-safety-security-research/.*

[112] Jason Koebler, *Flock Exposed Its AI-Powered Cameras to the Internet. We Tracked Ourselves.*, 404 MEDIA (Dec. 22, 2025), https://www.404media.co/flock-exposed-its-ai-powered-cameras-to-the-internet-we-tracked-ourselves.

[113] Walicek, *Vast Camera System Feeds Information*, *supra* note 110.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

b. **Unsupported operating system:** "Flock cameras still run on Android Things 8.1— an outdated mobile system that, crucially, has been discontinued and is no longer supported by Google with security patches. Unsupported operating systems are essentially undefended, riddled with known exploits."

c. **Unprotected testing data:** "Flock . . . left its internal testing data accessible online: a trove that included police names and phone numbers, patrol areas, suspect hotlists, full license plates and even geographic information systems (GIS) data showing the live location of patrol cars."

145. In response to the GainSec white paper, Flock released a statement attempting to reassure customers: "Overall, none of the vulnerabilities detailed in the report have an impact on our customers' ability to carry out their public safety objectives. Exploitation of these vulnerabilities would not only require physical access to a device but also require intimate knowledge of internal device hardware. No customer action is required in response to this disclosure." [114]

146. This statement is misleading at best. A popular YouTuber, Benn Jordan, posted a detailed video showing how a lay person could easily hack a Flock Safety Camera in under 30 seconds.[115] In the video Jordan reviews six of the vulnerabilities detailed in the GainSec White Paper and noted that "[t]he failings are farcical for a purported 'security' company." To the extent these exploits require physical access to Flock cameras, that is easy to obtain because most are mounted in public areas. And, as Jordan demonstrated, the "basic vulnerabilities" in its systems "would be all too easy for even less experienced hackers to exploit. Any competent state or non-state actors, infiltrators of criminal or foreign intelligence origin, could have a field day."[116]

---

[114] *Response to Compiled Security Research on Flock Safety Devices*, FLOCK SAFETY: BLOG (Nov. 6, 2025), https://www.flocksafety.com/blog/response-to-compiled-security-research-on-flock-safety-devices [https://perma.cc/L3K6-6C79].

[115] Benn Jordan, *We hacked Flock Safety Cameras in under 30 Seconds.*, YouTube (Nov. 16, 2025), https://www.youtube.com/watch?v=uB0gr7Fh6lY.

[116] Walicek, *Vast Camera System Feeds Information*, *supra* note 110.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

147.    Flock is no stranger to embellishing its data privacy and security practices and audits. For example, Flock's Safety Security Center[117] lists "Security Certifications" without explaining which aspects of Flock's sprawling product offerings and internal systems are certified.[118] Moreover, many of its audits took place in prior years, before Flock rolled out newer products like, e.g., Flock Nova and Flock Alpha surveillance drone. Flock's slipshod data security and auditing practices are additional evidence that Flock does not take its legal compliance obligations seriously.

148.    Flock claims to be setting the standard for public safety technology and cybersecurity,[119] yet continues to be in blatant violation of the ALPR Privacy Act and intrusion of privacy standards.

**VI.    Flock's Illegal Sharing of California ALPR Data is Pervasive**

149.    Flock's unlawful sharing of ALPR data is widespread. It has now been publicly revealed that data from more than a dozen California law enforcement agencies has been or is currently being shared with out-of-state or federal law enforcement. This number is likely to grow as municipalities and law enforcement agencies review their sharing policies and audit logs.

150.    Whether through the National Lookup tool, 1:1 sharing agreements, side-door access, or through Flock's other investigative and AI-powered tools, Flock has enabled—and continues to enable—the illegal sharing of an untold number of California law enforcement agencies' ALPR data. By Flock's own admission, California entities were not excluded from National Lookup or 1:1 sharing agreements until Flock turned off these features in 2025. And even then, police departments can and have continued to participate in 1:1 out-of-state sharing

---

[117] *Flock Safety's Security Center*, FLOCK SAFETY, https://security.flocksafety.com/ [https://perma.cc/H5XE-GW63] (last accessed April 2, 2026).

[118] Zac Bentley, *Even if You Want Surveillance, Flock is a Bad Choice*, MASS 50501 (Mar. 20, 2026), https://mass50501.substack.com/p/even-if-you-want-surveillance-flock.

[119] Chris Castaldo, *Holding Ourselves to the Highest Standard to Protect Community Data*, FLOCK SAFETY: BLOG (Feb. 9, 2026), https://www.flocksafety.com/blog/flock-security-testing-bishop-fox-privacy [https://perma.cc/Y8EX-368U].

41

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

agreements, so long as they open up certain "gates". [120] These facts demonstrate the high likelihood that California drivers' ALPR data has been or continues to be unlawfully shared in locations where Flock operates.

## VII.    Flock's Facilitation of California Law Enforcement Agencies' Unlawful Information Sharing Is Highly Offensive

### A.    Flock's Network Amplifies Discriminatory Policing Practices

151.    The ALPR Privacy Act is necessary because ALPR systems are not neutral public-safety tools. On paper they are used to solve crime and make people feel safer, but in practice they frequently aid discriminatory policing, and disproportionately target low-income neighborhoods and communities. These tools embed and amplify longstanding policing bias by converting them into scalable surveillance.

152.    As noted by several privacy advocates and the ACLU, "police often disproportionately deploy license plate readers in communities experiencing poverty and historically overpoliced communities of color, regardless of crime rates."[121]

153.    Flock's nationwide network expands the reach and impact of these practices. While the system prompts officers to provide a reason for each search, audit logs reveal that these tools are used to enact prejudice on an unprecedented geographic scale. For instance, the Electronic Frontier Foundation has documented that more than 80 law enforcement agencies used pejorative terms for Romani people in Flock search logs.

---

[120] El Cajon Transparency Portal, *supra* note 9; Langley, *The Case for Principled Federal Cooperation supra* note 68.

[121] EFF–ACLU Joint Letter, *supra* note 40, at 2 (citing Dave Maass & Jeremy Gillula, *What You Can Learn from Oakland's Raw ALPR Data*, ELEC. FRONTIER FOUND. (Jan. 21, 2015), https://www.eff.org/deeplinks/2015/01/what-we-learned-oakland-raw-alpr-data; Barton Gellman & Sam Adler-Bell, *The Disparate Impact of Surveillance*, CENTURY FOUND. (Dec. 21, 2017), https://production-tcf.imgix.net/app/uploads/2017/12/03151009/the-disparate-impact-of-surveillance.pdf); *see also, e.g.*, Kaveh Waddell, *How License-Plate Readers Have Helped Police and Lenders Target the Poor*, THE ATLANTIC (Apr. 22, 2016), https://www.theatlantic.com/technology/archive/2016/04/how-license-plate-readers-have-helped-police-and-lenders-target-the-poor/479436 (summarizing data indicating that Oakland Police Department deployed ALPRs disproportionately, often in low-income areas and in neighborhoods with high concentrations of African-American and Latino residents")).

42

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

154.    Specific examples include the Sacramento Police Department, which in May 2025 ran at least six searches using a racial slur against Romani people, scanning across 468 networks and 12,885 cameras. Similarly, the Irvine Police Department ran eight searches using the term "roma" in early 2025, querying data from 29,364 devices.[122]

155.    These searches represent a trend that creates tangibly discriminatory outcomes. For example, data from Oak Park, Illinois, shows that 84% of drivers stopped in Flock-related traffic incidents are Black—despite Black people making up only 19% of Oak Park residents.[123]

156.    As above, the ALPR Privacy Act prohibits *all* ALPR data sharing with federal agencies and out-of-state law enforcement agencies, not simply data sharing conducted for an illicit, discriminatory purpose. The use and sharing of ALPR data for discriminatory purposes heightens the highly offensive nature of the widespread collection, storage, use, and sharing of ALPR data.

B.    **Cross-Jurisdictional Data Sharing Threatens Access to Abortion and Gender-Affirming Care in California**

157.    The weaponization of ALPR data extends beyond racial profiling, directly threatening individuals seeking constitutionally protected healthcare in California. Location information from California-based Flock cameras can be used by agencies in restrictive states to monitor clinics, track vehicles, and survey the movements of patients and providers.[124]

---

[122] Rindala Alajaji & Dave Maass, *License Plate Surveillance Logs Reveal Racist Policing Against Romani People*, ELEC. FRONTIER FOUND. (Nov. 3, 2025)*, https://www.eff.org/deeplinks/2025/11/license-plate-surveillance-logs-reveal-racist-policing-against-romani-people.

[123] *84% of drivers stopped by Oak Park police in Flock traffic stops were Black*, *supra* note 32.

[124] *See, e.g.*, Caroline Kitchener & Devlin Barrett, *Antiabortion lawmakers want to block patients from crossing state lines*, WASH. POST (June 29, 2022, at 18:17 ET), https://www.washingtonpost.com/politics/2022/06/29/abortion-state-lines (last updated June 30, 2022, at 8:30 ET); *Idaho governor signs 'abortion trafficking' bill into law*, AP NEWS (Apr. 6, 2023), https://apnews.com/article/idaho-abortion-minors-criminalization-b8fb4b6feb9b520d63f75432a1219588; Josh Moon, *Alabama AG: state may prosecute those who assist in out-of-state abortions*, ALA. POL. REP. (Sept. 15, 2022, at 6:30 CT), https://www.alreporter.com/2022/09/15/alabama-ag-state-may-prosecute-those-who-assist-in-out-of-state-abortions.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

158.    Indeed, the Electronic Frontier Foundation has reported that at least one Texas law enforcement officer searched Flock's national database, which at the time would have included results in California, for an investigation into a woman who had self-administered an abortion.[125]

159.    Given that multiple states have moved to criminalize obtaining or facilitating out-of-state abortions, sharing Flock data with their law enforcement agencies threatens anyone involved in abortion care within California.[126] Parallel efforts to criminalize out-of-state travel for gender-affirming care expose another vulnerable population to the same risks. The use of ALPR data to enable such extraterritorial prosecutions profoundly intensifies the highly offensive nature of the unauthorized data sharing Flock facilitates.

C.    **Flock's ALPR System Threatens Protected First Amendment Activity**

160.    "Aggregated location data allows law enforcement and private companies to create detailed profiles of a person's daily life. When considered in bulk, ALPR data can form an intimate

---

[125] Joseph Cox & Jason Koebler, *A Texas Cop Searched License Plate Cameras Nationwide for a Woman Who Got an Abortion*, 404 MEDIA (May 29, 2025), https://www.404media.co/a-texas-cop-searched-license-plate-cameras-nationwide-for-a-woman-who-got-an-abortion. Flock and the Johnson County, Texas, Sheriff initially insisted that the search was not "related to enforcing Texas's abortion ban" and that "media accounts" were "'false,' 'misleading,' and 'clickbait.'" These claims were proven false. *See* Dave Maass & Rindala Alajaji, *Flock Safety and Texas Sheriff Claimed License Plate Search Was for a Missing Person. It Was an Abortion Investigation.*, ELEC. FRONTIER FOUND. (Oct. 7, 2025), https://www.eff.org/deeplinks/2025/10/flock-safety-and-texas-sheriff-claimed-license-plate-search-was-missing-person-it ("New documents and court records obtained by EFF show that Texas deputies queried Flock Safety's surveillance data in an abortion investigation. The new information shows that deputies had initiated a 'death investigation' of a 'non-viable fetus,' logged evidence of a woman's self-managed abortion, and consulted prosecutors about possibly charging her."); Jason Koebler & Joseph Cox, *Police Said They Surveilled Woman Who Had an Abortion for Her 'Safety.' Court Records Show They Considered Charging Her With a Crime*, 404 MEDIA (Oct. 7, 2025), https://www.404media.co/police-said-they-surveilled-woman-who-had-an-abortion-for-her-safety-court-records-show-they-considered-charging-her-with-a-crime/.

[126] Dave Maass, *Automated License Plate Readers Threaten Abortion Access. Here's How Policymakers Can Mitigate the Risk*, ELEC. FRONTIER FOUND. (Sept. 28, 2022), https://www.eff.org/deeplinks/2022/09/automated-license-plate-readers-threaten-abortion-access-heres-how-policymakers.

44

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

picture of a driver's activities and even deter First Amendment-protected activities. This kind of targeted tracking threatens to erode fundamental freedoms of speech."[127]

161.    Law enforcement has used Flock ALPR data to track individuals exercising their First Amendment rights, including engaging in peaceful protest. Through an analysis of Flock's nationwide searches, Electronic Frontier Foundation found that "more than 50 federal, state, and local agencies ran hundreds of searches through Flock's national network of surveillance data in connection with protest activity."[128]

162.    Recent reports indicate that law enforcement agencies logged hundreds of searches related to political demonstrations over the ten months of logs analyzed, including No Kings protests, 50501 protests, Hands Off protests, and protests against deportation raids and in support of pro-Palestine activist Mahmoud Khalil.[129]

163.    Audit logs compiled by the website "Have I Been Flocked" show searches on the national network which appear to relate to protected activity, such as a search in North Carolina with the stated reason as "Mosque," a search in Iowa for a "protester" and a search from Akron, Ohio for "activist recording."[130]

164.    Thanks to Flock's vast network of ALPR data sharing, many of these searches had nationwide reach. For example, a Texas police department's search related to "KINGS DAY PROTEST" reached 1,774 networks.[131]

165.    As above, the ALPR Privacy Act prohibits all unauthorized ALPR data sharing with federal agencies and out-of-state law enforcement agencies, not just data sharing which

---

[127] SB274 Analysis, CALIFORNIA STATE ASSEMBLY COMMITTEE ON PRIVACY AND CONSUMER PROTECTION, https://apcp.assembly.ca.gov/system/files/2025-07/sb-274-cervantes-apcp-analysis.pdf, at 4 (last visited Feb. 22, 2026).
[128] Dave Maass and Rindala Alajaji, *How Cops Are Using Flock Safety's ALPR Network to Surveil Protesters and Activists*, ELEC. FRONTIER FOUND. (Nov. 20, 2025), https://www.eff.org/deeplinks/2025/11/how-cops-are-using-flock-safetys-alpr-network-surveil-protesters-and-activists.
[129] *Id.*
[130] *First Amendment Report*, Have I Been Flocked?, https://haveibeenflocked.com/first-amendment-records?sort=date_desc (last visited Feb. 19, 2026).
[131] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

appears to be investigating protected First Amendment activity. The use and sharing of ALPR data for tracking those engaging in protected First Amendment activity heightens the highly offensive nature of the widespread collection, storage, use, and sharing of ALPR data.

## VIII.   Flock's Active Concealment Tolls the Statute of Limitations

166.   Flock actively concealed its violations of the ALPR Privacy Act from both its own customers and the California public for years. As detailed above, Flock did not disclose to Californians that the National Lookup feature had been enabled, in many cases without the agency customers' knowledge or approval. When agency customers inquired, Flock attributed failures to "system bugs," "early settings," and "technical logging limitations" that prevented its customers or Californians from identifying the cause.

167.   For example, Flock assured its California customers that it "had no contracts with federal agencies," a representation that was false, as Flock had quietly entered into a pilot agreement with U.S. Border Patrol.[132] By misrepresenting the scope of federal agency access to its California customers' ALPR information, Flock prevented those Californians from discovering that their data was being shared in violation of the ALPR Privacy Act.

168.   Flock's California customers, the public at large, and Plaintiffs reasonably relied on Flock's misrepresentation that it did not share California ALPR data with about out-of-state and federal agencies.

169.   Plaintiffs Javorsky, Mayor, Whitney, Cursaro, Carnero, Aumiller, Applewhite, Smith, Arend, and Jordan did not know and, in the exercise of reasonable diligence, could not have known that Flock was violating the ALPR Privacy Act with respect to their ALPR data until investigative reporting and public records disclosures revealed the full scope of Flock's violations in late 2025 and early 2026.

170.   Plaintiffs' claims therefore did not accrue until early 2026, when Flock's violations became known or reasonably discoverable. Accordingly, the applicable limitations period is tolled

---

[132] *See* Soicher, *Direct access to tracking data*, *supra* note 64; Langley, *Ensuring Local Compliance*, *supra* note 48.

from the date of Flock's concealment until the date of public discovery, and Plaintiffs' claims extend to the full period during which Flock's violations caused harm.

## PLAINTIFFS' EXPERIENCES

### I.    Plaintiff Javorsky's Experience

171.    Plaintiff Daniel Javorsky is a resident of San Francisco, California.

172.    Plaintiff Javorsky currently owns and drives a white Audi A5 convertible.

173.    Plaintiff Javorsky regularly drives in San Francisco for day-to-day activities such as running errands, going to the gym, and visiting friends, including along routes with Flock cameras installed. Plaintiff Javorsky also regularly drives to Oakland, California, to visit friends, including along routes where Flock cameras are installed.

174.    Plaintiff Javorsky has regularly driven along these routes from 2022 until present.

175.    Because Flock cameras scan and collect the license plate, vehicle, and location information of every car passing by, Plaintiff Javorsky's license plate, vehicle, and location data has been and continues to be collected and stored by Flock.

176.    Flock cameras are situated such that Plaintiff Javorsky cannot drive for his regular activities without passing a camera. If Plaintiff Javorsky could easily avoid routes where Flock cameras are installed, he would, but he cannot.

177.    The location data collected by Flock from its sprawling network of cameras, including in San Francisco and Oakland, also allows those with access to Flock's systems to ascertain Plaintiff Javorsky's movement data.

178.    The data collected and stored by Flock, including from San Francisco and Oakland, has been shared with and is accessible by out-of-state and/or federal law enforcement agencies.[133]

---

[133] Chien, Tomo, *Oakland police illegally shared license plate data: lawsuit*, S.F. STANDARD (Nov. 18, 2025), https://sfstandard.com/2025/11/18/oakland-police-opd-lawsuit-flock-surveillance/; Chien, *Georgia, Texas cops illegally search*, supra note 7; *Why Are The Alameda County Sheriff And SFPD Sharing So Much Data With 287(g) agencies?* SECURE JUSTICE (Dec. 7, 2025), https://secure-justice.org/blog/why-are-the-alameda-county-sheriff-and-sfpd-sharing-so-much-data-with-287g-agencies.

179.    Given the pervasive nature of Flock's broad data sharing agreements, Plaintiff Javorsky's vehicle and location information data has been accessed by out-of-state and/or federal law enforcement agencies. Given the millions of illegal queries that Flock permitted, it is likely that Plaintiff Javorsky's information was illegally conveyed to out-of-state or federal law enforcement in the results of those queries.

180.    Plaintiff Javorsky is concerned about the continuous collection, aggregation, and sharing of his vehicle and location data, including with out-of-state and federal law enforcement agencies. Plaintiff Javorsky believes that continuous collection, aggregation, and sharing violates his privacy.

181.    Flock's tracking of Plaintiff Javorsky's driving patterns enables any authorized user of Flock's systems to generate a comprehensive, intimate portrait of his daily life, including when he leaves home, the activities he participates in, and the communities in which he travels. Disclosing this information to out-of-state and federal agencies constitutes the type of harm that the statute was enacted to address.

182.    Plaintiff Javorsky finds the unauthorized sharing of his vehicle, location, and movement data with out-of-state and federal law enforcement agencies highly offensive.

**II.    Plaintiff Mayor's Experience**

183.    Plaintiff Anthony Mayor lives in Marin County, specifically, San Rafael, California.

184.    Plaintiff Mayor currently owns and drives a red Kia Niro.

185.    Plaintiff Mayor regularly drives in San Francisco County, Marin County, and Napa County, including along routes where Flock cameras are installed.

186.    Plaintiff Mayor has regularly driven along these routes since May 2024.

187.    From 2022 to May 2024, Plaintiff Mayor regularly drove in San Mateo County and San Francisco County, also passing in front of Flock cameras.

188.    Because Flock cameras scan and collect the license plate, vehicle, and location information of every car passing by, Plaintiff Mayor's license plate, vehicle, and location data has been and continues to be collected and stored by Flock.

48

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

189.    Given the pervasive nature of Flock's broad data sharing agreements, Plaintiff Mayor's vehicle and location information data has been accessed by out-of-state and/or federal law enforcement agencies. Given the millions of illegal queries that Flock permitted, it is likely that Plaintiff Mayor's information was illegally conveyed to out-of-state or federal law enforcement in the results of those queries.

190.    Plaintiff Mayor's membership in and weekly travel to rehearsals and performances with the San Francisco Gay Men's Chorus constitutes protected expressive association under the First Amendment of the United State Constitution and under the California Constitution. LGBTQ organizations in California, including choral and performance groups, have historically been subjects of governmental surveillance and law enforcement interest.[134] Knowing that his movements to and from Chorus events are tracked and made available to out-of-state law enforcement agencies, including agencies in states that have enacted laws targeting LGBTQ+ individuals and organizations, Plaintiff Mayor has experienced anxiety and has tried to modify his travel patterns in an effort to reduce his surveillance exposure. This constitutes a concrete injury to his rights of association and privacy beyond the bare statutory violation.

191.    Flock's tracking of Plaintiff Mayor's commute pattern, his associational activities in the Castro District, and his part-time employment enables any authorized user of Flock's systems to generate a comprehensive, intimate portrait of his daily life, including when he leaves home, where he works, the organizations he participates in, and the communities in which he travels. Disclosing this information to out-of-state and federal agencies constitutes harm that the statute addresses.

192.    Flock cameras, including those in Marin County, San Francisco County, and Napa County, are situated such that Plaintiff Mayor cannot drive to and from work without passing a camera. Specifically, Plaintiff Mayor passes by twelve cameras on his daily commute to his job in San Francisco as a music teacher.

---

[134] *Spying Before Stonewall: How the FBI Secretly Tracked Gay Activists in the 1960s*, Vice (June 7, 2020); FBI files on the Mattachine Society, 1948–1971.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

193.    Plaintiff Mayor passes by dozens more Flock cameras driving to and from Napa County and San Francisco's Castro District for a part-time job and his weekly commitments as part of the San Francisco Gay Men's Chorus. This does not include any of the cameras he would pass by while running errands, like grocery shopping, or adjusting for heavy traffic days, which are common throughout the Bay Area. If Plaintiff Mayor could easily avoid routes where Flock cameras are installed, he would, but he cannot.

194.    The location data collected by Flock from its sprawling network of cameras, including in San Francisco, Marin, and Napa counties, also allows those with access to Flock's systems to ascertain Plaintiff Mayor's movement data.

195.    The ALPR data collected and stored by Flock, including from San Francisco, has been shared with and is accessible by out-of-state and/or federal law enforcement agencies.[135]

196.    Given the pervasive nature of Flock's broad data sharing agreements, Plaintiff Mayor's vehicle and location information data has been accessed by out-of-state and/or federal law enforcement agencies.

197.    Plaintiff Mayor is concerned about the continuous collection, aggregation, and sharing of his vehicle and location data, including with out-of-state and federal law enforcement agencies. Plaintiff Mayor believes that continuous collection, aggregation, and sharing violates his privacy.

198.    Plaintiff Mayor finds the unauthorized sharing of his vehicle, location, and movement data with out-of-state and federal law enforcement agencies highly offensive.

### III.    Plaintiff Whitney's Experience

199.    Plaintiff Brendan Whitney is a resident of Fresno, California.

200.    Plaintiff Whitney currently owns and drives a gray Honda Civic. He also drives a silver Toyota Rav 4, which he co-owns with his wife.

---

[135] Chien, *Georgia, Texas cops illegally search*, *supra* note 7.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

201. Plaintiff Whitney regularly drives from Fresno to Clovis, CA to commute to work. Plaintiff Whitney also commutes to Stockton, CA. Flock cameras are installed in these three cities and in locations along his typical driving routes.

202. Plaintiff also drives around and across Fresno to run errands and visit family. Plaintiff Whitney has regularly driven along these routes from 2022 until present.

203. Because Flock cameras scan and collect the license plate, vehicle, and location information of every car passing by, Plaintiff Whitney's license plate, vehicle, and location data have been and continues to be collected and stored by Flock.

204. Flock cameras, including those in Fresno and Clovis, are situated such that Plaintiff Whitney cannot drive for his regular activities without passing a camera. If Plaintiff Whitney could easily avoid routes where Flock cameras are installed, he would, but he cannot.

205. The location data collected by Flock from its sprawling network of cameras, including in Fresno and Clovis, also allows those with access to Flock's systems to ascertain Plaintiff Whitney's movement data.

206. Given the pervasive nature of Flock's broad data sharing agreements, it is likely that Plaintiff Whitney's vehicle and location information data has been made accessible by out-of-state and/or federal law enforcement agencies. Given the millions of illegal queries that Flock permitted, it is likely that Plaintiff Whitney's information was illegally conveyed to out-of-state or federal law enforcement in the results of those queries.

207. According to haveibeenflocked.com, at least one law enforcement agency has searched for Plaintiff Whitney's license plate number.

208. Plaintiff Whitney is concerned about the continuous collection, aggregation, and sharing of his vehicle and location data, including with out-of-state and federal law enforcement agencies. Plaintiff Whitney believes that continuous collection, aggregation, and sharing violates his privacy.

209. Flock's tracking of Plaintiff Whitney's driving patterns enables any authorized user of Flock's systems to generate a comprehensive, intimate portrait of his daily life, including when he leaves home, the activities he participates in, and the communities in which he travels.

51

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

Disclosing this information to out-of-state and federal agencies constitutes the type of harm that the statute was enacted to address.

210. Plaintiff Whitney finds the unauthorized sharing of his vehicle, location, and movement data with out-of-state and federal law enforcement agencies highly offensive.

**IV.** **Plaintiff Cursaro's Experience**

211. Plaintiff Larissa Marie Cursaro is a resident of Berkeley, California.

212. Plaintiff Cursaro currently owns and drives a green Ford C-Max.

213. Plaintiff Cursaro regularly drives all over the Bay Area for her work as a researcher and community organizer for a union, a role she started in late 2025. She commutes daily in her car from Berkeley to Oakland and along routes with Flock cameras installed, including at an intersection very close to her home in Berkeley. Her work also takes her to Fruitvale, California.

214. Prior to starting her current job, Plaintiff Cursaro regularly drove in and through Berkeley while attending graduate school and then working as Graduate Student Instructor at UC Berkeley.

215. Before moving to the Bay Area and within the last four years, Plaintiff Cursaro drove around Claremont, California and the surrounding cities.

216. In the past four years, Plaintiff Cursaro also drove to Ventura, California on a research trip for United Farm Workers.

217. Because Flock cameras scan and collect the license plate, vehicle, and location information of every car passing by, Plaintiff Cursaro's license plate, vehicle, and location data has been and continues to be collected and stored by Flock.

218. The Flock cameras, including in Berkeley, Oakland, Fruitvale, and throughout the East Bay are situated such that Plaintiff Cursaro cannot drive for her regular activities without passing a camera. If Plaintiff Cursaro could easily avoid routes where Flock cameras are installed, she would, but she cannot.

219. The location data collected by Flock from its sprawling network of cameras, including in Berkeley, Oakland, Fruitvale, and throughout the East Bay, also allows those with access to Flock's systems to ascertain Plaintiff Cursaro's movement data.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

220. The ALPR data collected and stored by Flock, including from Alameda County and Ventura, has been shared with and is accessible by out-of-state and/or federal law enforcement agencies.[136]

221. Given the pervasive nature of Flock's broad data sharing agreements, Plaintiff Cursaro's vehicle and location information data has been accessed by out-of-state and/or federal law enforcement agencies. Given the millions of illegal queries that Flock permitted, it is likely that Plaintiff Cursaro's information was illegally conveyed to out-of-state or federal law enforcement in the results of those queries.

222. The camera close to Plaintiff Cursaro's home captures her ALPR data as she comes and goes from her home. Plaintiff Cursaro finds the capture of her ALPR data while she comes and goes from her residence invasive of her privacy and highly offensive, in particular because it has been accessible by out-of-state and federal law enforcement agencies

223. Plaintiff Cursaro is concerned about the continuous collection, aggregation, and sharing of her vehicle and location data, including with out-of-state and federal law enforcement agencies. Plaintiff Cursaro believes that continuous collection, aggregation, and sharing violates her privacy.

224. Plaintiff Cursaro is aware of progressive activists like herself being targeted by the federal government using information gathered through surveillance technology.

225. Given her work organizing immigrants and other vulnerable groups being targeted by the federal government, Plaintiff Cursaro is especially concerned that she will be targeted by law enforcement for her work, or that she will be surveilled to gather more information about the groups she organizes.

---

[136] Wolfe, *Flock Contract Postponed*, *supra* note 12; Rodriguez, *Ventura County audit*, *supra* note 54.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

226.    Specifically, Plaintiff Cursaro is concerned that her ALPR data obtained by Flock cameras while organizing workers has been or could be accessed by or shared with federal law enforcement surveilling her activity.

227.    Plaintiff Cursaro also regularly attends and drives to political protests throughout Alameda County. Plaintiff Cursaro is concerned that her activism will make her a target of surveillance by law enforcement agencies, including those in the federal government.

228.    Plaintiff Cursaro is concerned that her ALPR data obtained by Flock cameras while driving to a protest has been or could be accessed by or shared with federal law enforcement surveilling her protest activity.

229.    Plaintiff Cursaro is Hispanic and has been profiled by police in the past, and she is concerned that Flock's surveillance will result in additional unjustified profiling and targeting.

230.    Flock's tracking of Plaintiff Cursaro's driving patterns, including driving to organize workers and to protests, enables any authorized user of Flock's systems to generate a comprehensive, intimate portrait of her daily life, including when she leaves home, the activities she participates in, and the communities in which she travels. Disclosing this information to out-of-state and federal agencies constitutes the type of harm that the statute was enacted to address.

231.    Plaintiff Cursaro finds the unauthorized sharing of her vehicle, location, and movement data with out-of-state and federal law enforcement agencies highly offensive.

V.    **Plaintiff Carnero's Experience**

232.    Plaintiff Salvador Carnero III is a resident of Hayward, California in Alameda County, California.

233.    Plaintiff Carnero currently owns and drives a blue Infinity G37. Prior to that and in the last four years, he drove a Chevy Impala LT.

234.    Plaintiff Carnero regularly drives from Hayward into San Francisco for his work. He has driven this route for the past 18 months. Before that, he would commute for work from Hayward to South City. There are Flock cameras along his regular routes. He has regularly driven in and around Hayward and Alameda County since 2022.

235. In the past four years, he has also driven through Mountain View, Santa Cruz, and possibly Menlo Park.

236. Because Flock cameras scan and collect the license plate, vehicle, and location information of every car passing by, Plaintiff Carnero's license plate, vehicle, and location data has been and continues to be collected and stored by Flock.

237. The Flock cameras in Alameda County and San Francisco are situated such that Plaintiff Carnero cannot drive for his regular activities without passing a camera. If Plaintiff Carnero could easily avoid routes where Flock cameras are installed, he would, but he cannot.

238. The location data collected by Flock from its sprawling network of cameras, including in Alameda County and San Francisco Counties, also allows those with access to Flock's systems to ascertain Plaintiff Carnero's movement data.

239. The ALPR data collected and stored by Flock from Alameda County, San Francisco, Santa Cruz, Mountain View, and Menlo Park has been shared with and is accessible by out-of-state and/or federal law enforcement agencies.[137]

240. Given the pervasive nature of Flock's broad data sharing agreements, Plaintiff Carnero's vehicle and location information data has been accessed by out-of-state and/or federal law enforcement agencies. Given the millions of illegal queries that Flock permitted, it is likely that Plaintiff Carnero's information was illegally conveyed to out-of-state or federal law enforcement in the results of those queries.

241. According to haveibeenflocked.com, at least one law enforcement agency has searched for Plaintiff Carnero's license plate number.

---

[137] Wolfe, *Flock Contract Postponed*, *supra* note 12; Chien, Georgia, Texas cops illegally search, *supra* note 7; Joan Hammel, *Eyes in the Sky, supra* note 51; Debenedetti, *California Cities Grow Wary*, supra note 10; Arden Margulis, *Menlo Park police broke state law, shared license plate data out of state*, PALO ALTO ONLINE (Aug. 19. 2025) ) [hereinafter Margulis, *Menlo Park police broke state law*], https://www.paloaltoonline.com/investigative-story/2025/08/19/menlo-park-police-broke-state-law-shared-license-plate-data-out-of-state/.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

242.    Plaintiff Carnero is concerned about the continuous collection, aggregation, and sharing of his vehicle and location data, including with out-of-state and federal law enforcement agencies. Plaintiff Carnero believes that continuous collection, aggregation, and sharing violates his privacy.

243.    Flock's tracking of Plaintiff Carnero's driving patterns, including driving to work, enables any authorized user of Flock's systems to generate a comprehensive, intimate portrait of his daily life, including when he leaves home, the activities he participates in, and the communities in which he travels. Disclosing this information to out-of-state and federal agencies constitutes the type of harm that the statute was enacted to address.

244.    Plaintiff Carnero finds the unauthorized sharing of his vehicle, location, and movement data with out-of-state and federal law enforcement agencies highly offensive.

**VI.    Plaintiff Aumiller's Experience**

245.    Plaintiff Timothy Jon Aumiller is a resident of Oakland, California

246.    Plaintiff Aumiller currently owns and drives a silver Chevy Cruz.

247.    Plaintiff Aumiller regularly drives in and around the Bay Area for his work as an organizer for a union, a role he has held since September 2025. He also commutes from his home to his office in Oakland. There are Flock cameras installed along his regular commuting route and near many of the hospitals where he goes to meet and organize workers.

248.    Plaintiff Aumiller has worked as a union organizer for most of his career, including over the past four years while living in Oakland. He has driven in and around Alameda County, Menlo Park, Mountain View, and Santa Cruz for this work.

249.    Because Flock cameras scan and collect the license plate, vehicle, and location information of every car passing by, Plaintiff Aumiller's license plate, vehicle, and location data has been and continues to be collected and stored by Flock.

250.    The Flock cameras in and around Alameda County are situated such that Plaintiff Aumiller cannot drive for his regular activities without passing a camera. If Plaintiff Aumiller could easily avoid routes where Flock cameras are installed, he would, but he cannot.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

251.    The location data collected by Flock from its sprawling network of cameras, including in Alameda County, Menlo Park, Mountain View, and Santa Cruz, also allows those with access to Flock's systems to ascertain Plaintiff Aumiller's movement data.

252.    The Alameda County, Menlo Park, Mountain View, and Santa Cruz ALPR data collected and stored by Flock has been shared with and is accessible by out-of-state and/or federal law enforcement agencies.[138]

253.    Given the pervasive nature of Flock's broad data sharing agreements, Plaintiff Aumiller's vehicle and location information data has been accessed by out-of-state and/or federal law enforcement agencies. Given the millions of illegal queries that Flock permitted, it is likely that Plaintiff Aumiller's information was illegally conveyed to out-of-state or federal law enforcement in the results of those queries.

254.    Plaintiff Aumiller is concerned about the continuous collection, aggregation, and sharing of his vehicle and location data, including with out-of-state and federal law enforcement agencies. Plaintiff Aumiller believes that continuous collection, aggregation, and sharing violates his privacy.

255.    Plaintiff Aumiller is aware of progressive activists like himself being targeted by the federal government using information gathered through surveillance.

256.    Given his work organizing immigrants and other vulnerable groups being targeted by the federal government, Plaintiff Aumiller is especially concerned that he will be targeted by law enforcement for his work, or that he will be surveilled to gather more information about the groups he organizes.

257.    Specifically, Plaintiff Aumiller is concerned that his ALPR data obtained by Flock cameras while organizing workers has been or could be accessed by or shared with federal law enforcement surveilling his activity.

---

[138] Wolfe, *Flock Contract Postponed*, *supra* note 12; Joan Hammel, *Eyes in the Sky, supra* note 51; Debenedetti, *California Cities Grow Wary*, *supra* note 10; Margulis, *Menlo Park police broke state law*, *supra* note 137.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

258.    Plaintiff Aumiller also regularly attends political protests throughout Alameda County. Plaintiff Aumiller is concerned that his activism will make him a target of surveillance by law enforcement agencies, including those in the federal government.

259.    Plaintiff Aumiller does not drive to protests because he knows a friend and fellow activist who arrived at a protest in her car and was immediately identified by name by the police monitoring the protest. That individual and Plaintiff Aumiller believe that the police used her vehicle's license to identify her.

260.    In order to minimize the chances of being surveilled a protest, Plaintiff Aumiller leaves his phone at home or turns it off before leaving his home to attend a protest. However, he cannot avoid ubiquitous surveillance cameras, even if he bikes to a protest.

261.    This alteration of Plaintiff Aumiller's conduct as a direct result of the surveillance constitutes a cognizable injury to his autonomy and privacy interests, independent of any specific unauthorized sharing.

262.    Flock's pervasive surveillance of Plaintiff Aumiller's movements has also caused him concrete harm in the form of a chilling effect on his constitutionally protected activities.

263.    Plaintiff Aumiller is concerned that his ALPR data obtained by Flock cameras while driving to a protest has been or could be accessed by or shared with federal law enforcement surveilling his protest activity.

264.    Flock's tracking of Plaintiff Aumiller's commute pattern, his associational activities with his union and political protests, and his employment enable any authorized user of Flock's systems to generate a comprehensive, intimate portrait of his daily life, including when he leaves home, where he works, the organizations he participates in, and the communities in which he travels. Disclosing this information to out-of-state and federal agencies constitutes the type of harm that the statute was enacted to address.

265.    Plaintiff Aumiller finds the unauthorized sharing of his vehicle, location, and movement data with out-of-state and federal law enforcement agencies highly offensive.

VII.    **Plaintiff Applewhite's Experience**

266.    Plaintiff Phylicia Renee Applewhite is a resident of El Cajon, California.

58

267. Plaintiff Applewhite currently owns and drives a white Chevy Trailblazer.

268. Plaintiff Applewhite regularly drives throughout El Cajon, La Mesa, and San Diego for day-to-day activities such as running errands and shopping including along routes with Flock cameras installed.

269. Plaintiff Applewhite has regularly driven along these routes since at least July 2021.

270. Plaintiff Applewhite also drives in the broader San Diego region as a part-time Uber and Lyft driver and has been doing so for the last nine years. She also drives to Yuma, Arizona a few times a year to visit family.

271. Because Flock cameras scan and collect the license plate, vehicle, and location information of every car passing by, Plaintiff Applewhite's license plate, vehicle, and location data has been and continues to be collected and stored by Flock.

272. The Flock cameras in El Cajon and the broader San Diego region are situated such that Plaintiff Applewhite cannot drive for her regular activities without passing a camera. If Plaintiff Applewhite could easily avoid routes where Flock cameras are installed, she would, but she cannot.

273. The location data collected by Flock from its sprawling network of cameras, including in El Cajon and the broader San Diego region, also allows those with access to Flock's systems to ascertain Plaintiff Applewhite's movement data.

274. The El Cajon and broader San Diego region ALPR data collected and stored by Flock has been shared with and is accessible by out-of-state and/or federal law enforcement agencies.[139]

275. Given the pervasive nature of Flock's broad data sharing agreements, Plaintiff Applewhite's vehicle and location information data has been accessed by out-of-state and/or federal law enforcement agencies. Given the millions of illegal queries that Flock permitted, it is

---

[139] El Cajon Transparency Portal, *supra* note 9.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

likely that Plaintiff Applewhite's information was illegally conveyed to out-of-state or federal law enforcement in the results of those queries.

276. Flock's tracking of Plaintiff Applewhite's driving patterns enables any authorized user of Flock's systems to generate a comprehensive, intimate portrait of her daily life, including when she leaves home, the activities she participates in, and the communities in which she travels. Disclosing this information to out-of-state and federal agencies constitutes the type of harm that the statute was enacted to address.

277. Plaintiff Applewhite is concerned about the continuous collection, aggregation, and sharing of her vehicle and location data, including with out-of-state and federal law enforcement agencies. Plaintiff Applewhite believes that continuous collection, aggregation, and sharing violates her privacy.

278. Plaintiff Applewhite finds the unauthorized sharing of her vehicle, location, and movement data with out-of-state and federal law enforcement agencies highly offensive.

**VIII.    Plaintiff Smith's Experience**

279. Plaintiff Ryan David Smith is a resident of San Francisco, California

280. Plaintiff Smith currently owns and drives a gray Ford F150 SuperCrew.

281. Plaintiff Smith regularly drives in San Francisco for day-to-day activities such as errands and to visit friends. He regularly drives from San Francisco to Lafayette and Walnut Creek, which involves driving over the Bay Bridge and through Alameda County. Plaintiff Smith also regularly drives from San Francisco to San Jose, which involves driving through Mountain View. There are Flock cameras installed along each of these routes, along which Plaintiff Smith has driven regularly since 2022.

282. From 2022 to 2024, Plaintiff Smith also commuted within San Francisco from his home to work, including along routes with Flock cameras installed.

283. Because Flock cameras scan and collect the license plate, vehicle, and location information of every car passing by, Plaintiff Smith's license plate, vehicle, and location data has been and continues to be collected and stored by Flock.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

284. Flock's tracking of Plaintiff Smith's driving patterns enables any authorized user of Flock's systems to generate a comprehensive, intimate portrait of his daily life, including when he leaves home, the activities he participates in, and the communities in which he travels. Disclosing this information to out-of-state and federal agencies constitutes the type of harm that the statute was enacted to address.

285. The Flock cameras in San Francisco, Alameda County, San Jose, Mountain View, and other areas which Plaintiff Smith drives in are situated such that Plaintiff Smith cannot drive for his regular activities without passing a camera. If Plaintiff Smith could easily avoid routes where Flock cameras are installed, he would, but he cannot.

286. In addition to the cameras along Plaintiff Smith's driving routes, there is a Flock camera installed at the intersection adjacent to Plaintiff Smith's residence. This camera captures Plaintiff Smith's ALPR data as he comes and goes from his home. Plaintiff Smith finds the capture of his ALPR data while he comes and goes from his residence invasive of his privacy and highly offensive, in particular because it has been accessible by out-of-state and federal law enforcement agencies.

287. The location data collected by Flock from its sprawling network of cameras, including in San Francisco, Alameda County, San Jose, Mountain View, and other areas where Plaintiff Smith drives, allows those with access to Flock's systems to ascertain Plaintiff Smith's movement data.

288. The San Francisco, Alameda County, and Mountain View ALPR data collected and stored by Flock has been shared with and is accessible by out-of-state and/or federal law enforcement agencies.[140]

---

[140] Chien, *Georgia, Texas cops illegally search*, *supra* note 7; Wolfe, *Flock Contract Postponed*, *supra* note 12; Joan Hammel, *Eyes in the Sky, supra* note 51.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

289.    Given the pervasive nature of Flock's broad data sharing agreements, Plaintiff Smith's vehicle and location information data has been accessed by out-of-state and/or federal law enforcement agencies. Given the millions of illegal queries that Flock permitted, it is likely that Plaintiff Smith's information was illegally conveyed to out-of-state or federal law enforcement in the results of those queries.

290.    Plaintiff Smith is concerned about the continuous collection, aggregation, and sharing of his vehicle and location data, including with out-of-state and federal law enforcement agencies. Plaintiff Smith believes that continuous collection, aggregation, and sharing violate his privacy.

291.    Plaintiff Smith finds the unauthorized sharing of his vehicle, location, and movement data with out-of-state and federal law enforcement agencies highly offensive.

IX.    **Plaintiff Arend's Experience**

292.    Plaintiff Sean Christopher Palad Arend is a resident of Sunnyvale, California

293.    Plaintiff Arend currently owns and drives gray Tesla Model 3 and red Mazda MX. Since 2022, Plaintiff Arend has also owned and/or regularly driven a yellow Ford Mustang and a red Honda Odyssey.

294.    Since 2022, Plaintiff Arend has regularly commuted from Sunnyvale to San Carlos for work. Plaintiff Arend also regularly drives to Mountain View to run errands. In the last four years, Plaintiff Arend has also regularly driven in San Francisco, San Jose, and Alameda County. These routes include driving on streets with Flock cameras installed.

295.    Because Flock cameras scan and collect the license plate, vehicle, and location information of every car passing by, Plaintiff Arend's license plate, vehicle, and location data has been and continues to be collected and stored by Flock.

296.    The Flock cameras, including in Sunnyvale, Mountain View, San Jose, San Francisco, and Alameda County, are situated such that Plaintiff Arend cannot drive for his regular activities without passing a camera. If Plaintiff Arend could easily avoid routes where Flock cameras are installed, he would, but he cannot.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

297.    The location data collected by Flock from its sprawling network of cameras in the cities and counties in which Plaintiff Arend has driven also allows those with access to Flock's systems to ascertain Plaintiff Arend's movement data.

298.    Flock ALPR data, including from Mountain View, San Jose, San Francisco, and Alameda County, has been shared with and is accessible by out-of-state and/or federal law enforcement agencies.[141]

299.    Given the pervasive nature of Flock's broad data sharing agreements, Plaintiff Arend's vehicle and location information data has been accessed by out-of-state and/or federal law enforcement agencies. Given the millions of illegal queries that Flock permitted, it is likely that Plaintiff Arend's information was illegally conveyed to out-of-state or federal law enforcement in the results of those queries.

300.    Plaintiff Arend is concerned about the continuous collection, aggregation, and sharing of his vehicle and location data, including with out-of-state and federal law enforcement agencies. Plaintiff Arend believes that continuous collection, aggregation, and sharing violate his privacy.

301.    Plaintiff Arend has driven to attend political protests and associational activities such as Pride, including in San Francisco San Jose, and plans to do so in the future. Plaintiff Arend is concerned that his ALPR data obtained by Flock cameras while driving to a protest has been or could be accessed by or shared with federal law enforcement surveilling his protest activity.

302.    Flock's tracking of Plaintiff Arend's driving patterns, including driving to protests, enable any authorized user of Flock's systems to generate a comprehensive, intimate portrait of his daily life, including when he leaves home, the activities he participates in, and the communities in which he travels. Disclosing this information to out-of-state and federal agencies constitutes the type of harm that the statute was enacted to address.

---

[141] Chien, *Georgia, Texas cops illegally search*, *supra* note 7; Wolfe, *Flock Contract Postponed*, *supra* note 12; Joan Hammel, *Eyes in the Sky, supra* note 51.

303.    Plaintiff Arend finds the unauthorized sharing of his vehicle, location, and movement data with out-of-state and federal law enforcement agencies highly offensive.

## X.    **Plaintiff Jordan's Experience**

304.    Plaintiff Kyle William Jordan is a resident of Santa Cruz, California.

305.    Plaintiff Jordan currently owns and drives a blue 2023 Subaru Outback. Prior to June 2024, Plaintiff Jordan owned and drove a silver 2013 Subaru Crosstrek.

306.    Since 2022, Plaintiff Jordan has regularly driven in Santa Cruz, including along routes with Flock cameras installed. Since moving to Santa Cruz in August 2024, this has included driving for his day-to-day activities including leisure and errands. Sometime on or around February 2026, the City of Santa Cruz terminated its contract with Flock Safety.

307.    Since 2022, Plaintiff Jordan has also regularly driven in the cities of Capitola, Seaside, San Jose, and Mountain View, California, including along routes with Flock cameras installed.

308.    Because Flock cameras scan and collect the license plate, vehicle, and location information of every car passing by, Plaintiff Jordan's license plate, vehicle, and location data has been and continues to be collected and stored by Flock.

309.    Flock's tracking of Plaintiff Jordan's driving patterns, including driving to protests, enable any authorized user of Flock's systems to generate a comprehensive, intimate portrait of his daily life, including when he leaves home, the activities he participates in, and the communities in which he travels. Disclosing this information to out-of-state and federal agencies constitutes the type of harm that the statute was enacted to address.

310.    Flock cameras, including in Santa Cruz, Capitola, Seaside, San Jose, and Mountain View, were and are situated such that Plaintiff Jordan could not and cannot drive for his regular activities without passing a camera. If Plaintiff Jordan could easily avoid routes where Flock cameras are installed, he would, but he cannot.

311.    The location data collected by Flock from its sprawling network of cameras, including in the cities in which Plaintiff has driven, also allows those with access to Flock's systems to ascertain Plaintiff Jordan's movement data.

312.    The ALPR data Flock collects and stores, including from Santa Cruz, Capitola, Seaside, and Mountain View, has been shared with and is accessible by out-of-state and/or federal law enforcement agencies.[142]

313.    Given the pervasive nature of Flock's broad data sharing agreements, Plaintiff Jordan's vehicle and location information data has been accessed by out-of-state and/or federal law enforcement agencies. Given the millions of illegal queries that Flock permitted, it is likely that Plaintiff Jordan's information was illegally conveyed to out-of-state or federal law enforcement in the results of those queries.

314.    Plaintiff Jordan is concerned about the continuous collection, aggregation, and sharing of his vehicle and location data, including with out-of-state and federal law enforcement agencies. Plaintiff Jordan believes that continuous collection, aggregation, and sharing violates his privacy.

315.    Plaintiff Jordan has driven to attend political protests, including in Santa Cruz, and plans to do so in the future. Plaintiff Jordan is concerned that his ALPR data obtained by Flock cameras while driving to a protest has been or could be accessed by or shared with federal law enforcement surveilling his protest activity.

316.    Specifically, Plaintiff Jordan is concerned that attending protests could make him a target of surveillance and retaliation by law enforcement agencies, including those in the federal government. Plaintiff Jordan is concerned that the federal government may retaliate against him for his protest activity because he has read about anti-ICE protesters having their TSA precheck authorization revoked.

317.    Plaintiff Jordan finds the unauthorized sharing of his vehicle, location, and movement data with out-of-state and federal law enforcement agencies highly offensive.

---

[142]Joan Hammel, *Eyes in the Sky, supra* note 51; *New California Report, Old Flock Shenanigans*, Have I Been Flocked? (Mar. 5, 2026), https://haveibeenflocked.com/news/ca-queries; Debenedetti, *California Cities Grow Wary*, *supra* note 10.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

**XI.    Plaintiffs' Data from Flock Cameras Has Economic Value**

318.    Every day, commercial entities purchase data about individuals—including their location history—from data brokers[143] and other sources to run advertisements and target their services.[144]

319.    For the past decade, data brokers have sought out and combined data from private and public sources. While individual data sources "may provide only a few elements about a person's activities, data brokers combine these elements to form a detailed, composite view of the consumer's life."[145]

320.    Fusing Flock's ALPR data, including historical data about an individual's movements, with other data taken from ad tech and other companies enhances the economic value of any of the millions of existing datasets on California drivers.

321.    Moreover, it is easy to see how information regarding someone's daily commute or vehicle alone could be valuable to advertisers. For example, where vehicles travel reveals an astonishing amount about the purchasing decisions, lifestyles, and interests of its occupants.

322.    Indeed, Flock itself developed its "Nova" product to fuse—and thus enhance the value of—both third-party and Flock datasets for commercial purposes.[146]

323.    The movement data Flock collects thus has economic value to its owners, including to Plaintiffs. Flock has collected this data without compensating Plaintiffs. By misappropriating

---

[143] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

[144] Justin Sherman, *Data Brokers and Sensitive Data on U.S. Individuals: Threats to American Civil Rights, National Security, and Democracy*, at 2 (2021), Duke Sanford Cyber Policy Program, https://techpolicy.sanford.duke.edu/report-data-brokers-and-sensitive-data-on-u-s-individuals/ (last visited Feb. 26, 2026).

[145] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/10.1145/2817946.2817957 (last visited Feb. 26, 2026).

[146] *See supra*, paragraphs 68–69.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

Plaintiffs' data, Flock has caused Plaintiffs to suffer a concrete economic injury sufficient to establish standing under the UCL.

324.    Plaintiffs find the unauthorized sharing of their vehicle, location, and movement data, and the fusing of such data with sensitive information from third-party sources to generate even more detailed insights about Plaintiffs highly offensive.

## CLASS ACTION ALLEGATIONS

325.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seeks certification of the following classes (hereinafter referred to as "the Class"):

> All individuals whose license plate data was collected in California by the Flock ALPR system and was accessible by, and thus disclosed to, federal law enforcement agencies and/or out-of-state agencies since the first Flock camera was installed in California (the "Class Period").

326.    Plaintiffs also seek certification of the following subclass (hereinafter referred to as "the Search Subclass"):

> All individuals whose license plate data was collected in California by the Flock ALPR system and appeared as the result of any search or query performed by federal law enforcement agencies and/or out-of-state agencies during the Class Period.

327.    The Class is defined by reference to objective, verifiable criteria: whether a California Flock customer's ALPR data was accessible by out-of-state and/or federal law enforcement agencies and whether an individual's vehicle passed a camera operated by that Flock customer during the relevant period. The Search Subclass is defined by reference to specific searches conducted by federal or out-of-state agencies. Both subgroups are therefore ascertainable through Flock's own business records without individualized inquiry.

328.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director; any Judge who adjudicates this case, including their staff and immediate family; persons who properly execute and file a timely request for exclusion from the Class; persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; Plaintiffs' counsel and

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

Defendant's counsel; and the legal representatives, successors, and assigns of any such excluded person.

329.   Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

330.   Ascertainability. Members of the Class ("Class Members") are ascertainable because the definition provides a definition which allows putative class members to identify themselves as having a right to recover, and provides an objective, concrete basis for which to determine who will be bound by a judgment.

331.   Numerosity. The Class Members are so numerous that joinder of all members is impracticable. There are millions of drivers throughout California whose license plates were photographed, time stamped, and geolocation data collected by Flock and Flock's policies have permitted unauthorized sharing of this data with federal agencies, out-of-state agencies, and the general public. Because of the sophisticated nature and detailed, ongoing collection, Flock will be able to identify all these individuals through their amassed records.

332.   Predominance. Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

(a) Whether Flock implemented and maintained a policy that complied with California's ALPR Privacy Act;

(b) Whether Flock complies with the Notice, Privacy, Security, Audit, and Proper-Use Requirements set forth in California's ALPR Privacy Act;

(c) Whether Flock gathered location data and license plan scans of Class Members;

(d) Whether Flock's policies permit unauthorized access of Flock ALPR data owned by California law enforcement agencies by federal agencies or out-of-state law enforcement agencies;

(e) Whether Class Members' data was shared with out-of-state or federal agencies;

(f) Whether Flock knew or should have known that its infrastructure and inadequate policy facilitated unauthorized sharing of Class Members' ALPR data with federal and out-of-state agencies;

(g) Whether Flock knowingly violated the ALPR Privacy Act;

(h) Whether the unauthorized sharing of Class Members' ALPR data has harmed the Class;

(i) Whether Flock's violations of California law have harmed the class; and

(j) Whether Flock is subject to punitive damages under California's ALPR Privacy Act and California common law.

333. Typicality. Plaintiffs' claims are typical of those of other Class Members because all had their ALPR data compromised as a result of Flock's lax policy and infrastructure.

334. Adequacy. Plaintiffs will fairly and adequately represent and protect the interests of Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to Members of the Class and the infringement of the rights, and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

335. Superiority. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

336. Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards

69

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

337.    Unless a class-wide injunction is issued, Defendant will continue disclosing and retaining on its platform Class Member ALPR data, and Flock may continue to act unlawfully as set forth in this Complaint, particularly given its long history of ignoring and facilitating evasion of California law.

338.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to Class Members as a whole is appropriate.

339.    Issue Certification. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

340.    Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and/or the discovery process.

**COUNT I: VIOLATION OF CALIFORNIA'S ALPR PRIVACY ACT**
**Cal. Civ. Code §§1798.90.5 *et seq.***
**(On behalf of Plaintiffs, the Class, and the Search Subclass)**

341.    Plaintiffs incorporate all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class and Subclass.

342.    Flock operates a nationwide ALPR system that captures photographs of license plates and detailed physical characteristics of vehicles, together with the location, time, and date of Plaintiffs' and the Class's travels, which can be searched via web interface or application.

343.    Flock is both an ALPR operator under Cal. Civ. Code § 1798.90.5(c) and an ALPR end-user under the ALPR Privacy Act because it operates an ALPR system and accesses or uses an ALPR system to train its AI algorithms and build new product features.

344.    As an ALPR operator and end-user in California, Flock is legally required to (1) maintain reasonable security procedures to protect ALPR information; (2) implement and enforce

70

a usage and privacy policy ensuring collection and sharing respects individual privacy and civil liberties; and (3) monitor its system to ensure security and compliance with law. Flock is prohibited from allowing ALPR information to be used for any purpose not authorized by its own policy and compliant with the ALPR Privacy Act.

345.    The ALPR Privacy Act explicitly prohibits the sale, sharing, or transfer of ALPR information except to another California "public agency." Despite this, Flock designed and maintained a system with inadequate security and privacy controls that facilitated the unlawful sharing of California residents' ALPR data.

346.    Flock failed to implement basic technological safeguards that would have prevented California law enforcement data from being accessed by federal agencies (including ICE and CBP) and out-of-state law enforcement agencies.

347.    Among other security failures, Flock did not require MFA for access to or searches of its ALPR database, allowing California ALPR data to be shared with out-of-state and federal agencies. Flock's unreasonable security practices were demonstrated by a researcher's recent exposure of fifty-one (51) distinct vulnerabilities in its hardware and software.

348.    Flock knew or should have known that its failure to implement and maintain adequate privacy and security measures would permit unauthorized information sharing with federal agencies and out-of-state law enforcement agencies in violation of the ALPR Privacy Act.

349.    It was practically certain that unauthorized sharing of ALPR information with federal agencies and out-of-state law enforcement agencies in violation of the ALPR Privacy Act would follow from Flock's unlawful conduct of permitting national lookups of California ALPR information, 1:1 sharing agreements between California law enforcement agencies and agencies in other states, preventing "side-door" access to Californians' information, for example by mandating MFA, and other failures to implement and maintain adequate privacy and security measures. Moreover, even after promising to end its nationwide network, Flock actively worked to help law enforcement agencies violate California law, for example, by encouraging the use of 1:1 sharing agreements. As a result, Flock intentionally, or at the very least knowingly and recklessly, violated the ALPR Privacy Act.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

350. Flock did not introduce measures that would have prevented California law enforcement agencies' ALPR data from being shared with federal agencies or out-of-state agencies, such as blocking sharing of California ALPR data with federal agencies and out-of-state law enforcement agencies or giving California law enforcement agencies the option to limit sharing of their ALPR data to only "public agencies" as defined by the ALPR Privacy Act.

351. Flock deliberately collected Plaintiffs' and the Class's ALPR information and disclosed that information to its out-of-state and federal law enforcement customers, allowing them to identify physical characteristics and movement patterns of, and locations visited by, Plaintiffs' and Class Members' vehicles, as well as potentially other identifying information.

352. Flock's failure to implement these required safeguards constitutes a willful and reckless disregard for California law and resident privacy. Its conduct is highly offensive to a reasonable person, amounts to willful and reckless disregard of the law, and has directly harmed Plaintiffs and the Class by exposing their sensitive personal information, such as location and movement information, to unauthorized entities.

353. Flock's conduct was at all relevant times in willful and in reckless disregard of California's ALPR Privacy Law.

354. Plaintiffs seek actual or liquidated damages of not less than $2,500 per violation, punitive damages, and any other preliminary and equitable relief the Court deems to be appropriate.

## COUNT II: NEGLIGENCE
### (On behalf of Plaintiffs, the Class, and the Search Subclass)

355. Plaintiffs incorporate all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class and Subclass.

356. Flock owed Plaintiffs and Class Members a duty to prevent unauthorized sharing and to maintain reasonable and adequate information and data security practices.

357. Flock's duty is demonstrated by California's ALPR Privacy Act.

358. The ALPR Privacy Act expressly identifies California drivers as the class of persons its protections are intended to benefit. (See Cal. Civ. Code §1798.90.54 [providing a

72

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

private cause of action to "an individual harmed by a violation"].) Flock, as the operator and architect of the surveillance infrastructure, was therefore aware that Flock's failure to implement adequate sharing controls would injure California drivers specifically. This awareness further establishes Flock's duty of care to Plaintiffs and the Class.

359. Flock breached that duty by violating the ALPR Privacy Act—allowing federal and out-of-state agencies to access California ALPR data in direct violation of the ALPR Privacy Act and against the repeated warnings from the California Attorney General's office.

360. Flock further breached its duty by failing to implement reasonable security practices.

361. Plaintiffs and the Class have been injured by Flock's conduct because their ALPR information has been improperly shared with federal and out-of-state law enforcement agencies as well as, potentially, other unauthorized third parties. This has harmed Plaintiffs and the Class in ways enumerated above. Flock's facilitation of unlawful ALPR data sharing with federal agencies and out-of-state law enforcement agencies is highly offensive to a reasonable person.

362. As a direct and proximate cause of Flock's business practices, Plaintiffs and Class Members were damaged because their ALPR data has been improperly shared with federal and out-of-state agencies as well as, potentially, other unauthorized third parties, and that data was not properly safeguarded.

363. Flock's violation of the ALPR Privacy Act constitutes negligence per se, and its willful and reckless conduct warrants an award of compensatory and punitive damages.

364. Flock's failure to limit ALPR information-sharing and maintain reasonable and adequate information- and data-security practices was precisely the kind of conduct the ALPR Privacy Act was designed to prevent.

365. Plaintiffs and the Class are the class of persons the ALPR Privacy Act is intended to protect—drivers within California whose data is subject to ALPR collection.

366. Flock's willful and reckless breach of its duty caused Plaintiffs and the Class to suffer damages.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

367. Under California law—specifically, the evidentiary doctrine of negligence per se—these circumstances create a presumption of negligence.

368. There is no justification or excuse for Flock's violation of the ALPR Privacy Act.

369. Flock is therefore liable for compensatory and punitive damages under California law.

## COUNT III: INVASION OF PRIVACY UNDER THE CALIFORNIA CONSTITUTION
### (On behalf of Plaintiffs, the Class, and the Search Subclass)

370. Plaintiffs incorporate all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class and Subclass.

371. Plaintiffs and Class Members have an interest in: (i) conducting lawful personal and political activities without surveillance, intrusion, or interference, including, but not limited to, the right to move from place to place without being subjected to highly intrusive and surreptitious surveillance and tracking; (ii) not having detailed profiles about their vehicle and movements generated and logged over a period of weeks, months, or years that third parties may use to determine their location and/or predict future movements; (iii) precluding the dissemination, use, or abuse of the aforementioned information, including the fusing of this information with any other third party data sets profiles about Plaintiffs and Class Members; (iv) not sharing the aforementioned information with out-of-state or federal law enforcement agencies; and (v) controlling the dissemination of private information about themselves.

372. By conducting widespread and round-the-clock surveillance of Plaintiffs' and Class Members' movements using its ALPR technology, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

373. By aggregating and analyzing Plaintiffs' and Class Members' vehicle characteristics and movements over extended periods of time using its proprietary software, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

74
FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

374.    By developing and deploying proprietary software capable of not just reading and logging a license plate number, but creating detailed profiles of vehicles, reporting past movements, and predicting future movements, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

375.    By developing and deploying proprietary software that allows Defendant to share the aforementioned information about Plaintiffs and Class Members with any of its customers across California and the United States, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

376.    By developing and deploying technology that allows Defendant to merge the aforementioned data about Plaintiffs and Class Members with data from external sources, including data brokers and credit reporting agencies, thus creating more detailed and commercially valuable profiles of Plaintiffs and Class Members, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

377.    Plaintiffs and Class Members do not expect that their daily travels would be recorded or that this information would be fused with non-Flock data sources such as information compiled by data brokers and credit reporting agencies, to generate detailed and highly personal profiles about them, let alone profiles that local and out-of-state law enforcement agencies may easily search, access, and act upon. Plaintiffs and Class Members do not and cannot know which categories of information Defendant may or may not be fusing with the detailed digital profiles it is compiling about them.

378.    By sharing data on California drivers' vehicles and movements with federal law enforcement agencies who have amassed information on individuals and are able to merge these datasets, Defendant further empowered the federal government to create detailed profiles of Plaintiffs engaged in lawful activity that the federal government is criminalizing, including participating in peaceful protests against the federal government. This has further intruded upon and eroded Plaintiffs' privacy rights.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

379. The nature and volume of the data collected is such that Defendant's practice of compiling comprehensive profiles of Plaintiffs' and Class Members violates their reasonable expectation of privacy.

380. The generation of detailed profiles on Plaintiffs and Class Members allow third parties to learn intimate details about Plaintiffs and Class Members' lives, thus allowing them to be targeted for advertising and political purposes and abrogating their autonomy and ability to control the dissemination and use of information about them. This also violated their reasonable expectation of privacy.

381. The right to privacy protects not only discrete pieces of information individually, but the reasonable expectations of the populace regarding the systematic aggregation and use of information about their activities.

382. The aggregation of location data which captures one's movements over time violates the populace's reasonable expectations of privacy.

383. Flock does not merely capture a license plate at a moment in time, it constructs a mosaic of each vehicle's movements, cross-references those movements against state and law enforcement databases, generates predictive behavioral profiles, and makes that mosaic available for search and analysis by thousands of law enforcement agencies across the country.

384. Plaintiffs and Class Members did not and could not authorize Defendants to intercept data on their activities.

385. By engaging in the aforementioned actions, Flock intentionally invaded Plaintiffs' and Class Members' privacy rights under the California Constitution.

386. This invasion of privacy is serious in nature, scope, and impact. Moreover, it constitutes an egregious breach of the societal norms underlying the right of privacy.

387. As a result of Flock's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

388. Plaintiffs and Class Members have been damaged as a direct and proximate result of Flock's invasion of their privacy and are entitled to just compensation, including monetary damages.

76

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

389. Plaintiffs and Class Members seek appropriate relief for this injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests.

390. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Flock's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights.

391. Such damages are needed to deter Flock from engaging in such conduct in the future.

392. Plaintiffs also seek such other relief as the Court may deem just and proper.

## COUNT IV: INTRUSION UPON SECLUSION
### (On behalf of Plaintiffs, the Class, and the Search Subclass)

393. Plaintiffs incorporate all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class and Subclass.

394. To state a claim for intrusion upon seclusion "[Plaintiffs] must possess a legally protected privacy interest … [Plaintiffs'] expectations of privacy must be reasonable … [and Plaintiffs] must show that the intrusion is so serious in 'nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.'" *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286-87 (2009).

395. Plaintiffs and Class Members have an interest in: (i) conducting lawful personal, professional, and political activities without surveillance, intrusion, or interference, including, but not limited to, the right to travel without being subjected to highly intrusive and surreptitious surveillance and tracking; (ii) not having detailed profiles about their vehicles and movements generated and logged over a period of weeks, months, or years for third parties to use to determine their location and/or predict future movements; (iii) precluding the dissemination, use, or abuse of the aforementioned information, including the fusing of this information with any other third party data sets or profiles about Plaintiffs and Class Members; (iv) not sharing the aforementioned information with out-of-state or federal law enforcement agencies; and (v) controlling the dissemination of private information about themselves.

77

396. By conducting widespread and round-the-clock surveillance of Plaintiffs' and Class Members' movements using its ALPR technology, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

397. By aggregating and analyzing Plaintiffs' and Class Members' vehicle characteristics and movements over extended periods of time using its proprietary software, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

398. By developing and deploying proprietary software capable of not just reading and logging a license plate number, but creating detailed profiles of vehicles, reporting past movements, and predicting future movements, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

399. By developing and deploying proprietary software that allows Defendant to share the aforementioned information about Plaintiffs and Class Members with any of its customers across California and the United States, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

400. By developing and deploying technology that allows Defendant to merge the aforementioned data about Plaintiffs and Class Members with data from external sources, including data brokers and credit reporting agencies, thus creating more detailed and commercially valuable profiles of Plaintiffs and Class Members, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

401. Plaintiffs and Class Members do not expect that their daily travels will be recorded or that this information will be fused with non-Flock data sources such as information compiled by data brokers and credit reporting agencies, to generate detailed and highly personal profiles about them, let alone profiles that local and out-of-state law enforcement agencies may easily search, access, and act upon. Plaintiffs and Class Members do not and cannot know which

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

categories of information Defendant may or may not be fusing with the detailed digital profiles it is compiling about them.

402. By sharing data on California drivers' vehicles and movements with federal law enforcement agencies who have amassed information on individuals and are able to merge these datasets, Defendant further empowered the federal government to create detailed profiles of Plaintiffs engaged in lawful activity that the federal government is criminalizing, including participating in peaceful protests against the federal government. This has further intruded upon and eroded Plaintiffs' privacy rights.

403. The nature and volume of the data collected is such that Defendant's practice of compiling comprehensive profiles of Plaintiffs' and Class Members violates their reasonable expectation of privacy.

404. The generation of detailed profiles on Plaintiffs and Class Members allow third parties to learn intimate details about Plaintiffs and Class Members' lives, thus allowing them to be targeted for advertising and political purposes and abrogating their autonomy and ability to control the dissemination and use of information about them. This also violated their reasonable expectation of privacy.

405. Plaintiffs and Class Members did not and could not authorize Defendants to intercept data on their activities.

406. The conduct described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms.

407. Plaintiffs and Class Members seek appropriate relief for this injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests.

408. Accordingly, Plaintiffs and Class Members and California Subclass Members seek all relief available for invasion of privacy claims under common law.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

## COUNT V: VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### (On behalf of Plaintiffs, the Class, and the Search Subclass)

409. Plaintiffs incorporate all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

410. Plaintiffs plead this claim for equitable relief, including restitution and injunctive relief, in the alternative to their claims for damages.

411. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

412. Flock engages in unlawful business practices in connection with its disclosure of ALPR data belonging to Plaintiffs and Class Members' to federal and out-of-state law enforcement agencies despite the legal, moral, ethical, and policy requirements against doing so.

413. Flock's acts, omissions, and conduct, as alleged herein, constitute "business practices" within the meaning of the UCL.

414. Flock violated the "unlawful" prong of the UCL by violating, inter alia, Plaintiffs' and Class Members' constitutional rights to privacy, state privacy statutes, state consumer protection statutes, and ALPR technology specific statutes.

415. Flock's acts, omissions, and conduct also violate the unfair prong of the UCL because those acts, omission, and conduct offend public policy (namely the ALPR Privacy Act) and constitute immoral, unethical, oppressive, and unscrupulous activities that cause substantial injury, including Plaintiffs and Class Members.

416. Flock's conduct was unfair because it knew or should have known that it was collecting and sharing sensitive personal information and continued to do so despite knowing about Californians' privacy rights and the harms that could result by disseminating such information to federal and out-of-state law enforcement agencies, as well as creating detailed profiles of Plaintiffs and Class Members using third party data and its proprietary software.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

417. As the California Legislature made clear when passing the ALPR Privacy Act, the harm caused by Flock's conduct outweighs any potential public safety benefits attributable to such conduct, and there are reasonable alternatives to further Flock's legitimate business interests other than Flock's conduct described herein.

418. As a result of Flock's violations of the UCL, Plaintiffs and Class Members are entitled to injunctive relief. This is particularly true since the dissemination of Plaintiffs' and Class Members' ALPR is ongoing. Such injunctive relief should require Flock to permanently cease all sharing of Californians' ALPR information on its platform with any out-of-state or federal law enforcement organizations, and to immediately delete all information about Californians that out-of-state or federal law enforcement agencies are storing on the Flock platform.

419. Plaintiffs and Class Members have suffered an injury-in-fact as a proximate result of the violations of law and wrongful conduct of Flock alleged herein, including the loss of the economic value of their data, deprivation of the property right to exclude others from accessing or using their personal location and movement information, and the infringement of their statutory and California constitutional privacy rights. The damages remedies under Counts I to IV do not provide an adequate remedy for the ongoing and prospective harms Flock's unfair and unlawful business practices continue to cause absent injunctive relief.[147] Plaintiffs seek an injunction to end Flock's wrongful practices pursuant to § 17203.

420. Flock has been unjustly enriched by its violations. Flock profits from paid contracts with customers, to which it advertises its national ALPR network. To boost sales, Flock boasts of

[147] Specifically, Flock's 1:1 sharing feature remains operational and continues to facilitate California ALPR data sharing with out-of-state and federal agencies, Flock's fusion center agreements remain in place, Flock's FreeForm search tool remains accessible to out-of-state users, and Flock has announced its intent to expand federal data-sharing through "principled federal cooperation" programs. Damages for past violations will not prevent these future harms. Only Injunctive relief compelling Flock to redesign its platform to affirmatively prevent unauthorized sharing, rather than merely permitting its customers to opt out, will provide complete relief. The injunctive relief available under the UCL is prospective and system in nature and is not duplicative of the legal remedies available in Counts I-IV. There is no adequate remedy at law for those prospective injuries.

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG

its system's broad sharing abilities. The national sharing network—including the ability of out-of-state and federal law enforcement customers to access ALPR data from California, the most populous state in the United States—increases Flock's customer base, the value of its products, and in turn, Flock's profits. Flock has thus been unjustly enriched by the illegal use of Plaintiffs' and Class Members' ALPR data to increase sales and profits.

421. Plaintiffs and Class Members are entitled to restitution of the economic value of their data that Flock misappropriated without authorization or compensation. Plaintiffs and the Class also seek an order requiring Flock to make full restitution of all monies it received through its wrongful conduct, along with all other relief permitted under Cal. Bus. & Prof. Code §§ 17200 et seq.

**PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the proposed Classes, respectfully request that the Court grant the following relief:

a. Certification of this action as a class action and appointment of Plaintiffs and Plaintiffs' counsel to represent the Classes;

b. A declaratory judgement that Defendant violated Cal. Civ. Code §§1798.90.5 *et seq.* and California common law;

c. An order enjoining Flock from engaging in or facilitating the unlawful practices and illegal acts described herein; and forcing Flock to delete any California ALPR information stored on its platform by anyone other than California law enforcement agencies.

d. An order awarding Plaintiffs and the Classes: (1) actual or liquidated damages (whichever is higher); (2) punitive damages—as warranted—in an amount to be determined at trial; (3) restitution in an amount to be determined at trial; (4) injunctive relief as the Court may deem proper; (5) reasonable attorneys' fees and expenses and costs of suit pursuant to Cal. Code of Civil Procedure § 1021.5 and/or other applicable law; (6) pre-judgment and post-judgment interest as provided by law; and (7) such other and further relief as the Court may deem appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, individually and on behalf of the proposed Classes, request a trial by jury of all claims that can be so tried.

Dated: April 3, 2026

**GIBBS MURA LLP**

By: */s/ David M. Berger*
David M. Berger (SBN 277526)
Jane Farrell (SBN 333779)
Jennifer Sun (SBN 354276)
Kate Walford (SBN 362658)
**GIBBS MURA LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: (510) 350-9700
Fax: (510) 350-9701
dmb@classlawgroup.com
jgf@classlawgroup.com
jsun@classlawgroup.com
kgw@classlawgroup.com

Gary M. Klinger*
Mike Acciavatti*
Heather M. Lopez (SBN 354022)
**Milberg PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Telephone: (331) 240-3015
gklinger@milberg.com
macciavatti@milberg.com
hmlopez@milberg.com

Daniel L. Warshaw (SBN 185365)
Matthew A. Pearson (SBN 291484)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
dwarshaw@pwfirm.com
mapearson@pwfirm.com

Renner K. Walker (SBN 295889)
Steven M. Nathan (SBN 153250)
Gisela Rosa (*pro hac vice*)

83

**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646) 357-1100
Facsimile: (212) 202-4322
rwalker@hausfeld.com
snathan@hausfeld.com
zrosa@hausfeld.com

*pro hac vice forthcoming*

*Attorneys for Plaintiffs*

FIRST AMENDED CLASS ACTION COMPLAINT
4:26-cv-02382-HSG